IN THE UNITED STATES DISTRICT COURT FOR THE
SOUTHERN DISTRICT OF IOWA
CENTRAL DIVISION

| | | |
|---|---|---|
| DAVID E. WATSON, P.C. | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Civil No. 4:08-CV-00442-RP-CFB |
| | ) | |
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| Defendant. | ) | |

---

## UNITED STATES' RESISTANCE TO DAVID E. WATSON, P.C.'S MOTION FOR SUMMARY JUDGMENT

---

The amount of compensation that Plaintiff, David E. Watson P.C. ("DEWPC")  paid

David Watson, its sole employee, officer, director, and shareholder, as wages in 2002 and 2003

is not a matter for summary judgment because genuine issues of material fact exist.  Contrary to

DEWPC's argument, the United States has the authority to assess employment taxes on

remuneration for services that DEWPC paid to Watson regardless of the label Watson gave to

that compensation.  The Court should find that the amount of compensation DEWPC paid

Watson as wages in 2002 and 2003 is a matter to be determined at trial.

### I.     STATEMENT OF FACTS

Setting legal formalities aside, David Watson is a de facto partner in an accounting firm.

As a result of that position, Watson received approximately $227,000 from the partnership in

2002 and approximately $245,000 from the partnership in 2003.  (Appendix at 44-48, 50-51,

Watson Dep. Tr. 49:8 - 53:8, 59:20 - 60:25.)  In both years, Watson worked for the benefit of the

partnership an average of 35 to 45 hours a week for about 46 weeks of the year.  (Appendix 39-

41, Watson Dep. Tr. 43:9 - 45:12.) Despite his significant earnings in 2002 and 2003, however, Watson treated only $24,000 of his total compensation from the partnership as remuneration for employment subject to FICA taxes.

Watson is an accountant with many professional attainments and years of experience. Watson received a bachelors degree in business administration with a specialization in accounting from the University of Iowa in 1982. (Appendix 15-16, Watson Dep. Tr. 7:16 -8:4.) He became a Certified Public Accountant in 1983, and received a masters degree in taxation from Drake University in 1993. (Appendix 16-17, Watson Dep. Tr. 8:8 - 9:21.) Beginning in 1982, Watson practiced accounting at two different accounting firms, one of which was Ernst & Young, where Watson began specializing in partnership taxation. (Appendix 17-19, Watson Dep. Tr. 9:22 - 11:5.) During his years at Ernst & Young, Watson's salary ranged from a low of $21,635 to a high of $45,979; only in his first year did Watson earn less than $24,000. (Appendix 112, Exhibit 2019 at 39; Appendix 19-20, Watson Dep. Tr. 11:6 - 12:21.) After spending seven years at Ernst & Young, Watson left to open his own accounting firm. (Appendix at 20-21, Watson Dep. Tr. 12:22 -13:12.)

In 1992, Watson became a twenty-five percent shareholder in an accounting firm called Larson, Watson, Bartling & Eastman, P.C. ("LWBE") (Appendix at 20-21, Watson Dep. Tr. 12:22 - 13:12.) The remaining seventy-five percent of LWBE was owned by Tom Larson, Jeff Bartling, and Dale Eastman. (Appendix 22, Watson Dep. Tr. 14:14-20.) Watson estimates that the practice became profitable "within the first couple years." (Appendix 23, Watson Dep. Tr. 16:12-13.) In 1996, the ownership of the practice changed: instead of owning 25% of an accounting practice directly, Watson incorporated DEWPC, and caused DEWPC to become a

25% partner in Larson, Watson, Bartling & Eastman, LLP.  (Appendix at 27-29, Watson Dep. Tr. 21:1 - 23:10; Appendix 57-58, Exhibit 2004; Appendix 62-73, Exhibit 2013.)  The other partners to the practice were Thomas E. Larson, P.C., Jeffrey T. Bartling, P.C., and Dale A. Eastman, P.C.  (*Id.*)  By 1998, Paul Jeffer, P.C. had became a partner and Dale A. Eastman, P.C. had ceased being a partner to the practice (referred to hereinafter as "LWBJ").  (Appendix at 29, Watson Dep. Tr. at 23:16-23.)

The accounting work that Watson performed did not change significantly after LWBE became LWBJ.  (Appendix at 22, Watson Dep. Tr. 14:6-13 (referring to LWBJ as the "successor" to LWBE); Appendix at 31-32, Watson Dep .Tr. 29:19 - 30:12.)  What had changed was that Watson had interposed a corporate entity, DEWPC, between himself and the accounting practice.  On the same day LWBJ was formed, Watson, DEWPC, and LWBJ entered into an employment agreement.  (Appendix 54-56, 62-73, Exhibit 2003, Exhibit 2013 (indicating both were executed on October 11, 1996).)  Under the terms of the employment agreement, Watson became DEWPC's employee and agreed to provide his accounting services exclusively to LWBJ.  (Appendix 54-56, Exhibit 2003; Appendix at 30, Watson Dep. Tr. at 28:23-25.)  In 2002 and 2003, Watson could not practice accounting other than through LWBJ.  (*Id.*)  LWBJ provided Watson's professional liability insurance, and under the terms of the employment agreement, had the authority to determine how much vacation Watson could take.  (Appendix 54-56, Exhibit 2003; Appendix 31, Watson Dep. Tr. 29:1-10 (indicating that LWBJ did not actually impose limits on Watson's ability to take vacation).)  Notably, even though the employment agreement between DEWPC, Watson, and LWBJ obligates DEWPC to make its

employee available to LWBJ, the agreement does not require DEWPC to charge LWBJ for its

employee's work.  (Appendix 54-56, Exhibit 2003.)

During 2002 and 2003, Watson held himself out to the public as a specialist in

partnership taxation, who spends "a significant amount of time structuring and restructuring

businesses and real estate investments for tax purposes" and who "consistently designs tax-

advantaged ownership structures using various combinations of entities."  (Ostrovsky Report

dated January 15, 2010, Pl.'s Appx. at 105.)  Even though DEWPC is the partner in LWBJ, the

firm's website listed Watson as a partner.  (Appendix 24-26, Watson Dep. Tr. 18:3 - 20:5.)  It

still does.  LWBJ Financial, Our Leadership, Dave Watson, CPA (2009),

http://www.lwbj.com/aspx/LWBJ/WhyLWBJ.aspx?p=178&s=y.  In both 2002 and 2003,

Watson worked for the benefit of LWBJ an average of 35 to 45 hours a week for about 46 weeks

of the year.  (Appendix 39-41, Watson Dep. Tr. 43:9 - 45:12.)

DEWPC is a one-man operation.  Watson is DEWPC's only officer, only shareholder,

only director, and only employee.  (Appendix at 24-26, Watson Dep. Tr. 18:3 - 20:5.)  Moreover,

Watson is the only person who has ever been an officer, shareholder, director, or employee of

DEWPC.  (*Id.*)  Consequently, Watson is the only person to whom DEWPC distributed money in

2002 or 2003.  (Appendix 80, Exhibit 2019 at 7, Interrogatory 3.)  DEWPC has one checking

account, and Watson is the only person authorized to sign checks on that account.  (Appendix

25-26, Watson Dep. Tr. 19:20 - 20:5)  When Watson borrowed money from DEWPC in 2002,

the loan carried no interest.  (Appendix 84, Exhibit 2019, Interrogatory 14 (indicating that

Watson borrowed $81,743 in 2002 and repaid exactly that amount through 2005).)

Watson had complete control over how much money flowed to him from LWBJ through DEWPC as salary and how much of that money flowed through to him as a dividend. (Appendix 80, Exhibit 2019 at 7, Interrogatory 4.) In 2002 and 2003, Watson received some money from LWBJ, through DEWPC, as both salary and dividends. In both years, Watson received $24,000 designated as salary from DEWPC and paid employment taxes on that amount. (Appendix 77-78, Exhibit 2019 at 4-5, Request for Admission 3; Appendix 38-39, 49, Watson Dep. Tr. 42:5 - 43:3, 58:12-15.) At shareholder meetings he held with himself in 2000, 2001 and 2002, Watson authorized himself to be paid a salary of $24,000 in 2001, 2002 and 2003. (Appendix 34-37, Watson Dep. Tr. 36:7 - 37:13, 38:6 - 39:1; Appendix 59, Exhibit 2008, (for 2001); Appendix 60, Exhibit 2009 (for 2002); Appendix 61, Exhibit 2010 (for 2003).) This amount is less than the average starting salary for a 2002 or 2003 accounting graduate from the University of Iowa, and is $2,000 *lower* than the *lowest* starting salary for a 2003 University of Iowa accounting graduate. (Ostrovsky Report dated January 15, 2010, Pl.'s Appx. at 101.) In setting his salary, Watson did no research other than to talk to Larson, Bartling, and Jeffer to reach an agreement on what salary they would each pay themselves. (Appendix at 32-33, 34-36, Watson Dep. Tr. 30:18 - 31:24, 36:25 - 38:1.)

In addition to this $24,000, Watson received approximately $203,000 from LWBJ in 2002 in the form of dividends from DEWPC. (Appendix 44-48, Watson Dep. Tr. 49:8 - 53:8.) According to his financial records, Watson received this $203,000 in twenty-four installments, eighteen of which were for exactly $5,000. (Appendix 76, 93, Exhibit 2019 at 3, 20; Appendix 43-48, Watson Dep. Tr. 48:25 - 53:8.) In 2003, Watson received $24,000 in self-described

salary plus $231,577 from LWBJ in the form of dividends from DEWPC.[1]  (Appendix 50-51;

Watson Dep. Tr. 59:20 - 60:25.)  Significantly, all of DEWPC's 2002 and 2003 income came

*exclusively* from LWBJ.[2]  (Appendix 41-42, 50, Watson Dep. Tr. 45:2 - 46:6, 59:4-19.)  Watson

has also testified that in some cases he may have taken distributions directly from LWBJ and

placed them into his personal checking account without first placing the money in DEWPC's

checking account.  (Appendix 43, Watson Dep. Tr. 48:1-15.)  Watson has admitted that in 2002

and 2003, his monthly living expenses exceeded the $2,000 he was earning in "salary" from

DEWPC.  (Appendix 79, Exhibit 2019 at 6, Request for Admission 10.)

Following an IRS examination, the IRS determined that in addition to the $24,000

DEWPC reported paying Watson in wages, the corporation also paid Watson $134,730.05 as

remuneration for employment in 2002 and $175,470.00 as remuneration for employment in

2003.  Based on the increases to Watson's wages, the IRS assessed $48,519.30 in taxes,

penalties, and interest for eight quarters of 2002 and 2003.  (Appendix 114-145, IRS Forms 4340

Certificates of Assessment.)  Plaintiff paid a portion of the taxes assessed and sued for a refund.

(Dkt. 1.)  During this litigation, the United States has reconsidered how much of Watson's total

compensation properly should be considered remuneration for employment.  An IRS valuation

expert is prepared to testify that of the funds Watson received from DEWPC in 2002 and 2003,

---

[1]Due to a reduction in a 2002 loan from DEWPC to Watson, it is possible that the actual
amount of money that flowed from LWBJ to DEWPC to Watson in 2003 was not $231,577 but
$190,093.  At his deposition, Watson could not say with certainty.  (Appendix 52-53, Watson
Dep. Tr. 64:24 - 65:17.)

[2]During 2002 and 2003, Watson engaged in a songwriting endeavor, purportedly through
DEWPC, but this activity did not make any money in either year.  (Appendix 42, 50; Watson
Dep. Tr. 46, 59.)

$91,044 of Watson's total compensation should be considered remuneration for employment, a $67,044 increase to Watson's compensation for both years.  (Ostrovsky Report dated January 15, 2010, Pl.'s Appx. at 120.)

## II.    *LEGAL STANDARD*

Summary judgment is appropriate if "the record, when viewed in the light most favorable to the nonmoving party, shows there is no genuine dispute of material fact and that the moving party is entitled to judgment as a matter of law."  Ferguson v. United States, 484 F.3d 1068, 1072 (8th Cir. 2007) (internal citations omitted).  Upon review of a motion for summary judgment, the Court must give the party opposing the motion the benefit of all favorable inferences.  Holloway v. Lockhart, 813 F.2d 874, 878 (8th Cir.1987).

## III.    *ARGUMENT*

DEWPC argues that Watson's intent in classifying payments to himself, as reflected in DEWPC's corporate minutes and tax returns, operates to limit the United States' ability to recharacterize Watson's compensation from non-taxable dividends to taxable wages.  This argument is flawed in two fundamental ways.  First, the economic substance of the transactions between DEWPC and Watson governs what portion of Watson's total compensation is considered wages; Watson's subjective intent controls nothing.  Second, even if Watson's intent matters, that intent must be determined from the totality of the circumstances, not merely self-serving the  corporate resolutions and returns Watson prepared for his wholly-owned corporation.  The facts here show Watson operated his company with an intent to avoid paying employment taxes on his compensation.  Accordingly, the Court should deny DEWPC's motion for summary judgment.

A.    *Courts have repeatedly held that the economic substance—not intent—is the proper focus in cases involving disguised compensation.*

Watson is hardly the first taxpayer who has attempted to use the corporate form to avoid paying FICA taxes.  In other cases where S-Corporation owner-employees have attempted to avoid employment taxes by paying themselves low wages and large dividends, courts have found that the economic substance of the relationship between the S-Corporation and its owner-employee controls, not the intent of the owner-employee in making payments.

The Federal Insurance Contribution Act (FICA) imposes a tax on wages received with respect to employment.  26 U.S.C. §§ 3101, 3111 (2006).  FICA defines wages broadly to include "all remuneration for employment."  *Id.* at § 3121(a).  Under federal law, "The name by which the remuneration for employment is designated is immaterial.  Thus, salaries, fees, bonuses, and commissions on sales or on insurance premiums, are wages if paid as compensation for employment." 26 C.F.R. § 31.3121(a)-1(c) (2009).  Dividends, however, are not subject of employment taxes because those distributions of corporate profit are not remuneration for employment.  *HB&R, Inc. v. United States*, 229 F.3d 688, 690 (8th Cir. 2000).

Thus, S-Corporation owners have an incentive to take their corporation's earnings as dividends, royalties, or rent rather than wages, which are subject to employment taxes.  The income of an S-Corporation is taxed to the corporate owner regardless of whether the income is distributed.  *Joseph Radtke, S.C. v. United States*, 712 F.Supp. 143, 144 (E.D. Wis. 1989).  It is well-established that C-Corporations have the incentive to minimize double-taxation by disguising distributions of corporate profits as deductible salary expenses.  *Charles Schneider & Co. v. Comm'r*, 500 F.2d 148, 152 (8th Cir. 1974) (requiring close scrutiny for deductions a

corporate taxpayer claimed for salaries paid to owner-employees).  As recently explained by the

Court of Appeals for the Seventh Circuit, however,

> The owners of a Subchapter S corporation . . . have the opposite incentive—to
> alchemize salary into earnings.  A corporation has to pay employment taxes, such
> as state unemployment insurance tax and social security tax, on the salaries it
> pays.  A Subchapter S corporation can avoid paying them by recharacterizing
> salary as a distribution of corporate income.  To limit the ability of
> shareholder-employees to minimize their salaries and thus the company's
> employment taxes, the government requires that they be paid "reasonable
> salaries."

*Constr. & Design Co. v. United States*, 563 F.3d 593, 595-96 (7th Cir. 2009) (J. Posner).

In light of the incentive S-Corporation owners face, courts have found that where S-

Corporation owners determine their own compensation, close scrutiny of the wages paid is

required to determine whether the corporate owners are "alchemizing" wages into a type of

compensation not subject to employment taxes.  These courts have consistently found that this

close scrutiny involves examining the economic substance and circumstances surrounding the

payments from the S-Corporation to its owner-employee, not merely the labels the owner-

employee chose to give those payments.

For example, Mr. Spicer was an accountant who was the president, director, and

shareholder of Spicer Accounting, Inc.  He was the company's only accountant, although the

company also had an employee.  Spicer paid himself no wages, and claimed the company's

earnings as dividends.  *Spicer Acctg., Inc. v. United States*, 918 F.2d 90, 91-92 (9th Cir. 1990).

The court found that "salary arrangements between closely held corporations and its

shareholders warrant close scrutiny," and that what must be scrutinized is "the economic

substance of the transaction, not the form."  *Id.* at 92.  After examining the amount and type of

work Spicer performed for his accounting firm, the court found "that Mr. Spicer's *intention of*

*receiving the payments as dividends has no bearing on the tax treatment of these wages.*"  *Id.* at 93 (emphasis supplied).

Similarly, a veterinary orthopedist spent 33 hours per week working for his wholly-owned S-Corporation, of which he was the only officer and the only person authorized to sign corporate checks.  The orthopedist, Dr. Sadanaga, was the source of all of the firm's revenue.  Dr. Sadanaga paid himself no salary, but did receive "non-employee compensation" from the S-Corporation.  *Veterinary Surgical Consultants, P.C. v. Comm'r*, 117 T.C. 141, 142-43 (Tax Ct. 2001), *aff'd sub nom. Yeagle Drywall Co. v. Comm'r*, 54 Fed. Appx. 100 (3d Cir. 2002), *cert denied* 539 U.S. 943 (2003).  Because he was the company's sole source of income and sole full-time worker, the court found that the "distributions" were actually remuneration for employment.  The court observed,

> The characterization of the payment to Dr. Sadanaga as a distribution of [his corporation's] net income is but a subterfuge for reality; the payment constituted remuneration for services performed by Dr. Sadanaga on behalf of [his corporation].  An employer cannot avoid Federal employment taxes by characterizing compensation paid to its sole director and shareholder as distributions of the corporation's net income, rather than wages.  Regardless of how an employer chooses to characterize payments made to its employees, the true analysis is whether the payments represent remuneration for services rendered.

*Id.* at 145-46.  The implications of the quoted language is clear: it is the economic substance of the payments, not the intention of the corporation or its owner, that determines whether compensation is remuneration for employment.

Remuneration for employment can be disguised as payments other than dividends.  Charlotte Odell formed an S-Corporation in which she and her husband were the only shareholders and directors.  Odell transferred to her S-Corporation most of the business assets

- 10 -

she used in her then-existing sole-proprietorship, but did not transfer her customer list.  Odell

allowed her S-Corporation to use the customer list and to receive the income from sales made to

those customers in exchange for the payment of a royalty based on a percentage of the S-

corporation's sales.  The S-Corporation paid royalties in addition to a salary of $400 per month.

*Charlotte's Office Boutique, Inc. v. Comm'r*, 121 T.C. 89, 92-95 (Tax Ct. 2003), *aff'd* 425 F.3d

1203 (9th Cir. 2005).  Odell created written agreements between herself and the S-Corporation

that embodied the employment agreement and royalty agreement.  *Id.* at 94-97.  The corporation

also paid Odell rent each year.  *Id.* at 97.  The court found that because of the services Odell

performed for her corporation and the fact that Odell was the principal source of revenue for her

S-Corporation, the "rent" and "royalties" were really alchemized remuneration for employment.

The court gave little significance to the trivial amount of wages Odell paid herself under the

employment agreement because, although the corporation was young, the business was well-

established.  *Id.* at 105.  The court also dismissed the written royalty agreement, stating that

Odell could not "avoid the payment of Federal employment taxes simply by declaring that she

will be paying royalties to herself through a controlled corporation for its use of that property."

*Id.* at 106.  Once again, the court looked through the labels given to payments by the

shareholder-employee to analyze whether the payments were alchemized remuneration for

employment.

Finally, in a case very similar to this one, Jeffrey Dahl, a former CPA for Ernst & Young,

established an S-Corporation through which he practiced accounting.  Throughout the years at

issue, Dahl paid himself wages between $19,000 and $30,000 and dividends ranging from

$47,000 to $50,000.  The district court examined the economic relationship between Dahl and

the financial performance of his S-Corporation using the factors courts typically weigh when judging deductibility of compensation under I.R.C. section 162.  The court did not consider Dahl's intent, and concluded that his salary was unreasonably low when compared to other comparable accountants in firms with similar financial success.  *JD &Assoc. v. United States*, Case No. 3:04-cv-59, slip op.(D.N.D. June 5, 2006) (Appendix 146-156).

In each of these employment tax cases and in many others courts have not relied on superficial, self-serving evidence of intent; rather, they examined the economic relationship between the S-Corporation and its employee-owner to determine whether—on the particular facts of that case—the payments made were really "alchemized" remuneration for employment. *See Boles Trucking, Inc. v. United States*, 77 F.3d 236 (8th Cir. 1996) (upholding penalties imposed on 100% owner and officer who "ran taxpayer in all respects" but failed to pay FICA taxes on amounts that were remuneration for employment in substance but were characterized as "loans on future profits"); *Joseph M. Grey Public Accountant, P.C. v. Comm'r*, 119 T.C. 121 (Tax Ct. 2002) (finding S-Corporation accounting firm liable for FICA taxes on amounts paid as "independent contractor fees" to president and 100% owner, and finding that documents prepared solely for tax purposes should be given no weight), *aff'd* 93 Fed. Appx. 473 (3d. Cir. 2004);  *Yeagle Drywall Co., Inc. v. Comm'r*, T.C.M. 2001-284 (Tax Ct. 2001) (finding that distributions to 99% shareholder who performed substantial services for the S-Corporation were really compensation for services), *aff'd* 54 Fed. Appx. 100 (3d Cir. 2002); *Jacobs v. Comm'r*, T.C.M. 1993-570 (Tax Ct. 1993) (finding that S-Corporation cannot avoid paying FICA taxes by characterizing payments to director, officer, and shareholder as "consulting fees," and examining the substance of the relationship between owner and corporation to determine if an

employer/employee relationship existed). In contrast, the cases DEWPC cites in its brief largely involve a C-Corporation that paid money to owners as something other than wages, and then later desired to claim a wage expense deduction under 26 U.S.C. § 162 for those payments when the original treatment was disallowed. *Neonatology Assoc., P.A. v. Comm'r*, 299 F.3d 221, 228-233 (3d Cir. 2002) (denying deduction as compensation under section 162 for amounts originally treated as payments for term life insurance following IRS disallowance of deduction for payments as insurance premiums); *Bramlette Bldg. Corp. v. Comm'r*, 424 F.2d 751, 753-54 (5th Cir.1970) (denying deduction under section 162 for amounts originally paid as dividends following IRS determination that corporation was not eligible to file as an S-Corporation); *Paula Contr. Co. v. Comm'r*, 58 T.C. 1055, 1058-59 (same); *Elec. & Neon, Inc. v. Comm'r*, 56 T.C. 1324, 1341-42 (declining to permit deduction under section 162 for distributions of profits originally labeled loans following IRS determination such amounts were taxable to recipient). As DEWPC observes in its brief, however, "Section 162 . . . has no real application to the computation of the FICA taxes in dispute in this case." (Dkt. 13-1 at 9 n.3.) Thus, the cases the United States has cited in this section provide the better framework for analyzing the tax assessment made here.

   **B.**   *The facts in this case show that the money Watson received was, in substance, remuneration for services.*

   Drawing all inferences in favor of the United States, the facts in this case demonstrate that Watson's wages were unreasonably low because they did not reflect the economic reality of his relationship with DEWPC and LWBJ. The facts compelling this conclusion are set forth in detail in Part I of this brief, but the most significant facts are reiterated here: Watson is DEWPC's only officer, shareholder, director, and employee. (Appendix at 24-26, Watson Dep.

- 13 -

Tr. 18:3 - 20:5.) Watson's nominal salary of $24,000 from DEWPC, which he set himself, is less than he made in all but his first year working at Ernst & Young as a less experienced accountant. (Appendix 112, Exhibit 2019 at 39; Appendix 17-20, Watson Dep. Tr. 9:22 - 12:21.) The United States' expert witness will testify that in 2002 and 2003 Watson earned less than the average starting salary for an accountant graduating from the University of Iowa, and in 2003 he earned less than the 2003 University of Iowa accounting graduate with the lowest starting salary. (Ostrovsky Report dated January 15, 2010, Pl.'s Appx. at 101.)  Watson is the *only* person to whom DEWPC distributed any money in 2002 and 2003, and DEWPC's *only* income in those two years came from providing Watson's accounting services to LWBJ, which is a successor to LWBE, the accounting practice in which Watson was an owner.  (Appendix 80, Exhibit 2019 at 7, Interrogatory 3; Appendix 31-32, 41-42, 50, Watson Dep. Tr. 29:19 - 30:12, 45:18 - 46:22, 59:4-19.)  Watson received approximately $227,000 from LWBJ through DEWPC in 2002, and over $245,000 from LWBJ through DEWPC in 2003, but treated only about 10% of those amounts as remuneration for his accounting work.  (Appendix at 48, 50-51, Watson Dep. Tr. 53:1-8, 59:20 - 60:25.)  So little distinction is there between Watson and DEWPC that Watson testified it was possible he took the distributions directly from LWBJ and placed them in his bank account.  (Appendix 43, Watson Dep. Tr. 48:1-15.)  The distributions that Watson received from DEWPC in 2002 arrived in twenty-four installments and eighteen of those installments were for exactly $5,000.  (Appendix 76, 93, Exhibit 2019 at 3, 20; Appendix 44-47, Watson Dep. Tr. 49:8 - 52:10.)  The consistency of those payments strongly suggest they were salary for working at LWBJ and not dividends.  Meanwhile, Watson was spending an average of 35 to 45 hours per week working for LWBJ's benefit, and worked for LWBJ approximately 46 weeks per

year.  (Appendix 39-41, Watson Dep. Tr. 43:9 - 45:12.)  That Watson elected to interpose a

corporate entity with no meaningful economic substance between himself and LWBJ does not

entitle him to avoid paying FICA taxes on the remuneration he received for his employment.

Thus, in light of the inferences to be drawn from all of the facts surrounding the transactions

between Watson, DEWPC, and LWBJ, the Court should find that Watson received more than

$24,000 as remuneration for employment and should allow the case to proceed to trial at which

the Court can determine the amount of compensation Watson received for his accounting work.


Even if the Court were persuaded, as DEWPC argues, that Watson's intent in making

distributions controlled the outcome of this case, the facts here preclude summary judgment.

There is no dispute that the IRS did not *base its adjustment* on Watson's intent, but the IRS

clearly *considered* Watson's intent as part of its examination.  (Appendix 4, Olson Dep. Tr.

24:11-25 ("We believed that the primary reason for setting the salary at $24,000 was to minimize

Social Security tax.").)   In light of the incentives S-Corporation owner-employees face, the IRS

determined during its investigation that Watson intended to avoid employment taxes, and it made

an adjustment based on the fair value of Watson's services.  (*Id.*; Appendix 5, Olson Dep. Tr.

25:7-10.)  Similarly, at trial, the United States will introduce evidence from an expert witness as

to the fair value of Watson's services in light of the wages similarly-qualified accountants in and

around Iowa received in 2002 and 2003.  (*See* Ostrovsky Report dated January 15, 2010, Pl.'s

Appx. at 101-131.)

Intent is not easily determined; even under the cases DEWPC cites, courts must consider

the totality of the circumstances when examining a taxpayer's intent.  *See Bramlette Bldg. Corp.*

*v. Comm'r*, 424 F.2d 751, 753-54 (5th Cir. 1970) ("We recognize that whether a payment is compensation or dividend is a question of fact, that the mere labelling [sic] of a payment as a dividend is only evidence of its character and that the label should be accorded even less weight than usual in this case since dividends and salary in a Subchapter S corporation are treated similarly for tax purposes. . . . In determining whether amounts paid were compensation for services or were distributions of profits, all the facts and circumstances must be considered."); *Paula Contr. Co. v. Comm'r*, 58 T.C. 1055, 1060 (Tax Ct. 1972) ("[L]ables are not controlling . . . . [W]e have examined all of the evidence to ascertain the intent of the parties in making the payments . . . ."). This means DEWPC cannot hide behind its own self-serving corporate minutes and tax returns—the only evidence of Watson's intent DEWPC has presented. Watson's long work experience, the relationship between LWBE and LWBJ, Watson's specialization in using corporate entities to avoid taxes, the amount of time he spent working at LWBJ, the amount of money he received from LWBJ through DEWPC, and the small fraction of compensation Watson labeled a salary, at a minimum, permits at least an inference—if it does not conclusively show—that Watson actually intended to avoid employment taxes by labeling only $24,000 per year as wages. As explained in the preceding section, these are factors courts give careful scrutiny in determining that payments from S-Corporations are disguised wages. Further, courts have held that documents similar to DEWPC's corporate minutes are entitled to little weight since Watson stood on both sides of the transaction. *Charlotte's Office Boutique, Inc. v. Comm'r*, 121 T.C. 89, 97 (Tax Ct. 2003), *aff'd* 425 F.3d 1203 (9th Cir. 2005); *Joseph M. Grey Public Accountant, P.C. v. Comm'r*, 119 T.C. 121 (Tax Ct. 2002). Even if intent controlled the outcome of this case, self-serving corporate minutes and tax returns cannot carry the day in

- 16 -

the face of the many facts indicating Watson truly intended to alchemize his remuneration for employment into dividends.

Finally, DEWPC argues that Watson will decrease his Social Security benefits due to his election to receive the majority of his income as dividends rather than wages and that this shows a consequence beyond tax savings. (Dkt. 13-1 at 6-7.)  Perhaps, Watson would prefer to save for retirement by squirreling away dividends compensation from DEWPC disguised as income rather than paying into the Social Security system, but that is not his choice to make.  Like it or not, he cannot opt out: to the extent Watson receives remuneration for services he must pay the Social Security and Medicare taxes that benefits his fellow citizens.  *Spicer Acctg. v. United States*, 918 F.2d 90, 92-93 (9th Cir. 1990) (affirming the district court's treatment of dividends as wages over S-Corporation employee-shareholder's argument that he was foregoing Social Security benefits).

      **C.**      *The United States has the authority to recharacterize dividends paid to an S-Corporation owner-employee as wages subject to employment taxes.*

DEWPC argues that the United States does not have authority to "substitute its business judgment for DEWPC's", and states in a footnote (without citation) that the United States has no greater power to recharacterize dividends as wages than does a taxpayer.  (Dkt. 13-1 at 5, 7-8.) To the contrary, the many cases cited above demonstrate that the United States can and does examine the compensation paid to S-Corporation owner-employees and adjusts unreasonably low salaries to reflect the economic realities of the parties' transactions.  Moreover, the United States and DEWPC are not similarly situated because the United States has a law enforcement responsibility DEWPC does not.  Unlike DEWPC ,the executive branch of the government is tasked with enforcing the laws—including the internal revenue laws—enacted by Congress.  The

- 17 -

legislative branch has empowered the Secretary of the Treasury to ensure that taxpayers comply with these laws.  *See* 26 U.S.C. § 6201 (2006) (authorizing the Secretary of Treasury "to make the inquiries, determinations, and assessments of all taxes . . . imposed by this title . . . .").

Certainly, Watson is correct that he was not required to pay himself any statutorily-prescribed amount of salary.  But Watson cannot take money out of his accounting firm and avoid the employment tax laws simply by passing his compensation labeled as something else through a corporate entity.  As demonstrated by the many cases cited above, the United States can assess employment taxes in accordance with the economic reality of a taxpayer's transactions; it is not bound by the form of transaction the taxpayer chose.  DEWPC's complaints about the potential cost of S-Corporations setting reasonable salaries for employee-shareholders are misplaced.  When setting his annual salary, Watson consulted only the other de facto partners of LWBJ; he did no independent research on what similarly-situated accountants made and bore no significant expense in setting his salary.  More importantly, Watson—a self-professed partnership taxation specialist—chose to form an S-Corporation; Watson chose his salary; and, Watson alone chose to tempt fate by paying FICA taxes on only 10% of his total annual compensation.

IV.    *CONCLUSION*

For the foregoing reasons, the United States requests that the Court deny Plaintiff's

motion for summary judgment.

Dated this 5th day of April, 2010.

Respectfully submitted,

NICHOLAS A. KLINEFELDT
United States Attorney

 *s/ Robert E. Fay*
ROBERT E. FAY
VA Bar No. 74871
Attorneys for Plaintiff
Trial Attorney, Tax Division
U.S. Department of Justice
PO Box 7238
Ben Franklin Station
Washington, D.C. 20044
Telephone: (202) 305-9209
Fax: (202) 514-6770
Email: Robert.E.Fay@usdoj.gov

## CERTIFICATE OF SERVICE

IT IS HEREBY CERTIFIED that the foregoing UNITED STATES' RESISTANCE TO

DAVID E. WATSON, P.C.'S MOTION FOR SUMMARY JUDGMENT has been filed via the

Court's ECF system, which will provide electronic notice to the following:

Ronald L. Mountsier, Esq.
Smith, Schneider, Stiles & Serangeli, P.C.
604 Locust St., Ste. 1000
Des Moines IA 50309-3715


     *s/ Robert E. Fay*
ROBERT E. FAY
Trial Attorney, Tax Division
U.S. Department of justice
P.O. Box 7238
Washington, D.C.  20044
Telephone: (202) 305-9209
Facsimile: (202) 514-6770
Email: Robert.E.Fay@usdoj.gov