IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF IOWA
CENTRAL  DIVISION

| | | |
|---|---|---|
| DAVID E. WATSON, P.C, | * | |
| | * | 4:08-cv-442 |
| Plaintiff, | * | |
| v. | * | |
| UNITED STATES OF AMERICA, | * | |
| | * | ORDER |
| Defendant. | * | |

Before the Court is a Motion for Summary Judgment and Request for Oral Argument,
filed March 10, 2010 by David E. Watson, P.C. ("Plaintiff" or "DEWPC").  Clerk's No. 13.  The
United States of America ("Defendant") filed a resistance to the Motion on April 5, 2010.
Clerk's No. 14.  Plaintiff filed a Reply on April 13, 2010.  Clerk's No. 15.  Despite Plaintiff's
request, the Court does not believe oral arguments would substantially aid it in resolving the
present Motion.  The matter is, therefore, fully submitted.

I.  FACTUAL AND PROCEDURAL BACKGROUND

The facts of this case are largely undisputed.  David Watson ("Watson") graduated from
the University of Iowa in 1982, with a bachelor's degree in business administration and a
specialization in accounting.  Def.'s Statement of Additional Facts (hereinafter "Def.'s Facts") ¶
1.  Watson became a Certified Public Accountant ("CPA") in 1983, and received a master's
degree in taxation from Drake University in 1993.  *Id.* ¶ 2.  Between 1982 and 1992, Watson
practiced accounting at Ernst & Young, where he specialized in partnership taxation.  *Id.* ¶ 3.  In
1992, after leaving Ernst & Young, Watson joined with Tom Larson ("Larson"), Jeff Bartling
("Bartling"), and Dale Eastman ("Eastman") to form an accounting firm named Larson, Watson,

Bartling & Eastman ("LWBE").[1]  *Id.* ¶ 5; Def.'s App. at 21.  According to Watson, LWBE became profitable "within the first couple years."  Def.'s Facts ¶ 7.

On October 11, 1996, Watson incorporated DEWPC as an Iowa Professional Corporation ("PC").  Pl.'s Statement of Material Facts (hereinafter "Pl.'s Facts") ¶ 1.  Larson, Bartling, and Eastman also formed PCs, and on October 11, 1996, each of the four partners replaced their individual ownership in LWBE with ownership by their respective PC.  Def.'s Facts ¶¶ 8-9; Def.'s App. at 62-72.  On the same date, LWBE, DEWPC, and Watson entered into an employment agreement whereby Watson became DEWPC's employee and agreed to provide his accounting services exclusively to LWBE.  Def.'s Facts ¶¶ 12-13.  By 1998, Paul Jeffer, PC, had replaced Dale Eastman, PC as a partner, causing LWBE to be reformed as Larson, Watson, Bartling, and Jeffer ("LWBJ"), though neither the work performed by the firm, nor the employment arrangement between the firm, DEWPC, and Watson, changed significantly.  *Id.* ¶¶ 10-11.

As structured in 2002 and 2003, the years relevant to the present lawsuit, Watson provided accounting services exclusively to LWBJ and its clients as an employee of DEWPC.  Pl.'s Facts ¶ 6; Def.'s Facts ¶ 14.  Under the arrangement between Watson, DEWPC, and LWBJ, LWBJ provided professional liability insurance for Watson and had the authority to determine how much vacation Watson could take.  Def.'s Facts ¶ 15.  From 2002 to 2003, and continuing to the present, LWBJ's website listed Watson, rather than DEWPC, as a partner, and Watson held himself out to the public as a specialist in partnership taxation, who spends "a significant amount of time structuring and restructuring businesses and real estate investments for tax

---

[1] It appears that each partner owned a 25% share of LWBE.  *See* Def.'s Facts ¶¶ 5-6.

purposes" and who "consistently designs tax-advantaged ownership structures using various combinations of entities." *Id.* ¶¶ 16-17.

Since its inception, DEWPC has elected to be taxed as an S Corporation, and Watson has been its sole shareholder, employee, director, and officer. Pl.'s Facts ¶¶ 3-4, 7; Def.'s Facts ¶¶ 18-19. As such, Watson had complete control over the flow of money through DEWPC. *See* Def.'s Facts ¶ 22; Pl.'s Response to Def.'s Facts (hereinafter "Pl.'s Response") ¶ 22. Watson is the only person to whom DEWPC distributed money in 2002 or 2003.[2] Def.'s Facts ¶ 20. DEWPC has only one checking account, and Watson is the only person authorized to sign checks on that account. *Id.* ¶ 23. At shareholder meetings Watson held with himself in 2000-2002, Watson authorized for himself a salary from DEWPC in the amount of $24,000.00 annually. *Id.* ¶ 25. In selecting $24,000.00 as his salary, Watson did no research other than to talk to Larson, Bartling and Jeffer to reach an agreement on what salary each would pay himself. *Id.* ¶ 27. In 2002 and 2003, DEWPC did, in fact, pay Watson $24,000.00 in funds designated as salary and paid federal employment taxes on that amount. *Id.* ¶ 24.

DEWPC's 2002 and 2003 income came exclusively in the form of distributions from LWBJ. Def.'s Facts ¶ 32. DEWPC apparently then passed the distributions on to Watson, though Watson admits that, on occasion, he may have taken distributions from LWBJ and placed them directly in his personal checking account without first placing the money in DEWPC's checking account. *Id.* ¶ 35. In 2002, in addition to his $24,000.00 salary, Watson received checks from DEWPC totaling $203,651.00. Pl's Response ¶ 28. Watson received these checks

---

[2]   Some of the money distributed to Watson by DEWPC was in the form of an interest-free loan to Watson in 2002. Def.'s Facts ¶ 21.

in twenty-four separate installments during 2002, and eighteen of the installments were for exactly $5,000.00.  Def.'s Facts ¶ 29.  DEWPC recorded $118,159.00 of the payments to Watson in 2002 as dividend distributions to Watson.  Pl.'s Response ¶ 28.  In 2003, in addition to his $24,000.00 salary, Watson received $221,577.00 in dividend payments from DEWPC.  Def.'s Facts ¶ 30; Pl.'s Response ¶ 30.[3]  In both years, Watson worked for DEWPC an average of 35 to 45 hours per week for about 46 weeks per year.  Def.'s Facts ¶ 33; Pl.'s Response ¶ 33.  Watson also admitted that for both years, his monthly living expenses exceeded the $2,000.00 in "salary" he was receiving from DEWPC.  Def.'s Facts ¶ 36.

On or about February 5, 2007, the Internal Revenue Service ("IRS") assessed $48,519.30 in taxes, penalties, and interest against DEWPC for the eight calendar quarters of 2002 and 2003.  Def.'s Facts ¶ 37.  The IRS made these assessments after it determined that portions of the dividend distributions from DEWPC to Watson should be recharacterized as wages paid to Watson, subject to employment taxes under 26 U.S.C. § 3101 and § 3111.  Pl.'s Facts ¶ 8.  Specifically, the IRS contended that $130,730.05 of the dividend payments to Watson for 2002 should be recharacterized as wages subject to employment taxes, and that $175,470.00 of the dividend payments to Watson for 2003 should be recharaterized as wages subject to employment taxes.  Pl.'s Facts ¶¶ 9-10; Def.'s Response to Pl.'s Facts (hereinafter "Def.'s Response") ¶¶ 9-10.  Since the initial assessments were made, Defendant's expert witness, Igor Ostrovsky, has amended his opinion regarding how much of the dividend payments should be recharacterized as

---

[3] According to the parties:  "Due to a reduction in a 2002 loan from DEWPC to Watson, it is possible that the actual amount of money that flowed from LWBJ to DEWPC to Watson in 2003 was not $2[2]1,577 but $1[8]0,093.  At his deposition, Watson could not say with certainty."  Def.'s Facts ¶ 31; Pl.'s Response ¶ 31.

wages several times.  *See* Pl.'s Facts ¶¶ 11-13.  Currently, Defendant takes the position that

$67,044.00 of the dividend distributions should be recharacterized as wages for each of 2002 and

2003.  *Id.* ¶ 13.  On April 11, 2007, DEWPC paid Defendant $4,063.93 toward the assessments.[4]

Compl. ¶¶ 11-12; Def.'s Answer ¶¶ 11-12.  On June 27, 2007, DEWPC filed a claim for a refund

of its payment, but the claim was denied by the IRS on November 16, 2007.  Compl. ¶¶ 13-14.

DEWPC filed the present action on October 31, 2008, claiming that Defendant improperly

recharacterized dividend payments to Watson as wages and incorrectly determined that DEWPC

owed employment taxes on the improperly recharacterized funds.  *See generally* Compl.

Accordingly, Plaintiff requests that the Court order judgment in its favor in the amount of

$4,063.93, plus interest, costs, and reasonable litigation expenses.  *Id.*

## II.  STANDARD FOR SUMMARY JUDGMENT

Summary judgment has a special place in civil litigation.  The device "has proven its

usefulness as a means of avoiding full-dress trials in unwinnable cases, thereby freeing courts to

utilize scarce judicial resources in more beneficial ways."  *Mesnick v. Gen. Elec. Co.*, 950 F.2d

816, 822 (1st Cir. 1991).  In operation, the role of summary judgment is to pierce the boilerplate

of the pleadings and assay the parties' proof in order to determine whether trial is actually

required.  *See id.*; *see also Garside v. Osco Drug, Inc.*, 895 F.2d 46, 50 (1st Cir. 1990).

"[S]ummary judgment is an extreme remedy, and one which is not to be granted unless the

movant has established his right to a judgment with such clarity as to leave no room for

controversy and that the other party is not entitled to recover under any discernible

---

[4]  Plaintiff contends that the $4,063.93 was the additional tax, penalty, and interest for the calendar quarter ending December 31, 2002, but that the IRS erroneously applied the payment to the tax liability assessed for the first quarter of 2002.  Compl. ¶¶ 11-12.

circumstances." *Robert Johnson Grain Co. v. Chem. Interchange Co.*, 541 F.2d 207, 209 (8th Cir. 1976) (citing *Windsor v. Bethesda Gen. Hosp.*, 523 F.2d 891, 893 n.5 (8th Cir. 1975)).  The purpose of the rule is not "'to cut litigants off from their right of trial by jury if they really have issues to try,'" *Poller v. Columbia Broad. Sys., Inc.*, 368 U.S. 464, 467 (1962) (quoting *Sartor v. Ark. Natural Gas Corp.*, 321 U.S. 620, 627 (1944)), but to avoid "useless, expensive and time-consuming trials where there is actually no genuine, factual issue remaining to be tried." *Anderson v. Viking Pump Div., Houdaille Indus., Inc.*, 545 F.2d 1127, 1129 (8th Cir. 1976) (citing *Lyons v. Board of Educ.*, 523 F.2d 340, 347 (8th Cir. 1975)).

The plain language of Federal Rule of Civil Procedure 56(c) mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial.  *See Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).  The precise standard for granting summary judgment is well-established and oft-repeated:  summary judgment is properly granted when the record, viewed in the light most favorable to the nonmoving party and giving that party the benefit of all reasonable inferences, shows that there is no genuine issue of material fact, and the moving party is entitled to judgment as a matter of law.  *See* Fed. R. Civ. P. 56(c); *Harlston v. McDonnell Douglas Corp.*, 37 F.3d 379, 382 (8th Cir. 1994).  A court does not weigh the evidence nor make credibility determinations, rather it only determines whether there are any disputed issues and, if so, whether those issues are both genuine and material.  *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986); *Wilson v. Myers*, 823 F.2d 253, 256 (8th Cir. 1987) ("Summary judgment is not designed to weed out dubious claims, but to eliminate those claims with no basis in

material fact.").

Plaintiff bears the burden of proof in this case.  It is the unusual case where the party shouldering the burden of proof prevails on a summary judgment motion.  *See Turner v. Ferguson*, 149 F.3d 821, 824 (8th Cir. 1998) ("Summary judgments in favor of parties who have the burden of proof are rare, and rightly so.").  The moving party bears the initial burden of demonstrating the absence of a genuine issue of material fact based on the pleadings, depositions, answers to interrogatories, admissions on file, and affidavits, if any.  *See Celotex Corp.*, 477 U.S. at 323;  *Anderson*, 477 U.S. at 248.  Once the moving party has carried its burden, the nonmoving party must go beyond the pleadings and, by affidavits or by the depositions, answers to interrogatories, and admissions on file, designate specific facts showing that there is genuine issue for trial.  *See* Fed. R. Civ. P. 56(c), (e); *Celotex Corp.*, 477 U.S. at 322-23; *Anderson*, 477 U.S. at 257.  "[T]he mere existence of *some* alleged factual dispute between the parties will not defeat a motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact."  *Anderson*, 477 U.S. at 247-48 (emphasis in original).  An issue is "genuine," if the evidence is sufficient to persuade a reasonable jury to return a verdict for the nonmoving party.  *See id.* at 248.  "As to materiality, the substantive law will identify which facts are material . . . .   Factual disputes that are irrelevant or unnecessary will not be counted."  *Id.*

## III.  LAW AND ANALYSIS

The Federal Insurance Contributions Act ("FICA") imposes "on every employer an excise tax, with respect to having individuals in his employ, equal to [a certain] percentage[] of the wages paid by him with respect to employment."  26 U.S.C. § 3111(a).  The term "wages" is

defined broadly by FICA as "all remuneration for employment."[5]  26 U.S.C. § 3121(a).   Thus,

an employer, such as DEWPC, is required to pay FICA tax on all wages paid to its employees.

*See HB&R, Inc. v. United States*, 229 F.3d 688, 690 (8th Cir. 2000).  An employer is not,

however, obligated to pay FICA tax on "other types of employee income, such as dividends."

*Id*.  The parties are in agreement that Watson was an employee of DEWPC.  *See* Pl.'s Facts ¶ 4

("During the years 2002 and 2003, Watson was employed by [DEWPC], and was its only

employee.").  The parties are further in agreement that if the funds paid to Watson are properly

characterized as dividends, DEWPC need not pay FICA taxes on them, but that if the funds are

properly recharacterized as wages, DEWPC would be required to pay FICA tax.

     In its Motion for Summary Judgment, DEWPC contends that it "clearly intended to pay

[Watson] compensation of $24,000 per year, and that amounts distributed to Mr. Watson in

excess of that amount are properly classified as dividends and/or loans."  Pl.'s Br. at ii.  DEWPC

argues that "the United States does not have the authority to require that [DEWPC] pay any sort

of minimum salary to [Watson] before it can pay dividends to [Watson], and that the United

States' ability to assess additional employment taxes is limited to taxing payments which were

intended to be compensatory in nature."  *Id*. at ii-iii.  In short, Plaintiff argues that it is the intent

of DEWPC that controls whether funds paid to Watson are categorized as wages or as dividends.

*Id*. at 3-4.  According to Plaintiff, DEWPC's intent to pay Watson a salary of only $24,000 is

clearly evidenced by the Minutes of the Combined Meeting of the Shareholders and Directors of

DEWPC during the relevant time frame, which all evidence the fact that DEWPC intended to

---

[5]  The definition of "wages" contains numerous exceptions, none of which are applicable in the
present case.  *See* 26 U.S.C. § 3121(a)(1)-(23).

pay Watson $24,000.00 annually as salary, and intended to pay dividends "in the amount of available cash on hand after payment of compensation and other expenses of the corporation." Pl.'s App. at 17-20, 29-32.  Plaintiff cites *Electric & Neon, Inc. v. Commissioner of Internal Revenue*, 56 T.C. 1324 (1971), *Paula Construction Co. v. Commissioner of Internal Revenue*, 58 T.C. 1055 (1972), and *Pediatric Surgical Associates, P.C. v. Commissioner of Internal Revenue*, T.C. Memo 2001-81 (Apr. 2, 2001), in support of its position.

In *Electric & Neon*, the owners of a C corporation took loans from the corporation on a regular basis to pay ordinary expenses, but rarely or irregularly paid back such loans.  56 T.C. at 1327.  The IRS determined that the un-repaid loans should be considered dividend income.  *Id*. at 1330.  The owners sought to have the loans declared compensation for services rendered so that the corporation could deduct the funds as expenses.  *Id*. at 1340.  The Tax Court found that the owners could deduct the amount of compensation paid out, "so long as such payments (1) do not exceed the reasonable compensation for the services actually rendered, and (2) are actually intended to be paid purely for the services."  *Id*.  The IRS did not object to the first prong of the test, and conceded that if the loan payments were deemed compensation, they would not exceed the reasonable compensation for services actually rendered by the owners to the corporation.  *Id*. The IRS did, however, object to the second prong of the test, urging that the owners never *intended* for the loans to be compensation.  *Id*.  Noting that "[i]t is settled law that such intent must be shown as a condition precedent to the allowability of a deduction to the corporation," the Tax Court determined that the fact that funds were intended as loans undermined the owners' assertion that the funds were intended as compensation.  *Id*. at 1340-41 ("[Owners'] testimony that the withdrawals were intended to be loans does, in fact, tend to negate his alternative

argument that compensation was intended.").

The following year, the Tax Court reaffirmed in *Paula* that "it is now settled law that only if payment is made with the intent to compensate is it deductible as compensation." 58 T.C. at 1058. In *Paula*, an S corporation tried to argue that certain dividends paid to its stockholders were actually compensation for services rendered. *Id*. In refusing to recharacterize the dividends as wages, the Tax Court ignored the fact that the stockholders were not compensated for substantial services, finding that, aside from that fact, nothing in the record "indicates that compensation was either paid or intended to be paid" and that "[n]one of the evidence indicates that at the time those payments were made they were intended to be compensation for services performed." *Id*. at 1057-60.

Finally, in *Pediatric Surgical Associates, P.C.*, a C corporation deducted certain funds paid to shareholder surgeons as compensation. T.C. Memo 2001-81. The IRS "disallowed a portion of such deductions on the ground that a portion of the amounts paid to the shareholder surgeons was dividend rather than officers' compensation." *Id*. Stating that the burden was on the corporation to prove its intent to pay compensation, the court affirmed the recharacterization, finding that the "compensation" paid to the shareholder surgeons "exceed[ed] reasonable allowances for services actually rendered by them." *Id*.

Plaintiff would have the Court read these three decisions as standing for the proposition that DEWPC's stated subjective intent as to the purpose of its distributions to Watson controls the classification of the funds as either dividends or wages. The Court finds Plaintiff's citation to *Electric & Neon*, *Paula*, and *Pediatric Surgical Associates*, *P.C.* inapposite, however, because in each case, the *taxpayer* was attempting to recharacterize funds, whereas in the present case, it

is the Government that is attempting to recharaterize the funds.  One author addressed this

distinction in the 1993 edition of the Akron Tax Journal:

> The courts and the Service seem to have adopted a double standard.  In the context of taxpayer attempts at recharacterization, "intent" has dominated the decisions.  But the courts have found intent irrelevant where the Service is arguing for recharacterization.  This outcome may be justified to the extent the taxpayer is distorting the actual character of payments received from the corporation for tax advantage.

Harrington, Kirsten, *Employment Taxes:  What Can the Small Businessman Do?*  10 Akron Tax

J. 61, 69 (1993).   Indeed, the incentive for S corporations to distort the actual character of

payments to its shareholders/employees to obtain a tax advantage was recently articulated by

Judge Richard A. Posner:

> The distinction between accounting profits, losses, assets, and liabilities, on the one hand and cash flow on the other is especially important when one is dealing with either a firm undergoing reorganization in bankruptcy or a small privately held firm; in the latter case, in order to avoid double taxation (corporate income tax plus personal income tax on dividends), the company might try to make its profits disappear into officers' salaries.  *See Menard, Inc. v. Commissioner*, 560 F.3d 620, 621 (7th Cir. 2009).  The owners of a Subchapter S corporation, however, have the oppositive incentive–to alchemize salary into earnings.  A corporation has to pay employment taxes, such as state unemployment insurance tax and social security tax, on the salaries it pays.  A Subchapter S corporation can avoid paying them by recharacterizing salary as a distribution of corporation income.

*Constr. & Design Co. v. United States Citizenship & Immigration Servs.*, 563 F.3d 593, 595-96

(7th Cir. 2009).

Plaintiff's position that its own intent controls the characterization of funds paid to

Watson is further undermined by relevant IRS Revenue Rulings and by case law that is more in

line with the facts of this case than *Electric & Neon*, *Paula*, or *Pediatric Surgical Associates*,

*P.C.*  In a 1974 Revenue Ruling, two sole shareholders of a corporation sought advice on

whether they would incur liability for employment taxes on facts similar to the present case. Rev. Rul. 74-44 (1974). The shareholders "performed services for the corporation. However, to avoid the payment of Federal employment taxes, they drew no salary from the corporation but arranged for the corporation to pay them 'dividends' [in an amount equal to] the amount they would have otherwise received as reasonable compensation for services performed." *Id*. The IRS stated that the dividends "were reasonable compensation for services" performed by the shareholders "rather than a distribution of the corporation's earnings and profits." *Id*. Accordingly, the dividends would properly be characterized as "wages" for which "liability was incurred for the taxes imposed by [FICA and other federal employment taxes]." *Id*. This conclusion comports with an earlier Revenue Ruling stating:

> Neither the election by the corporation as to the manner in which it will be taxed for Federal income tax purposes nor the consent thereto by the stockholder-officers has any effect in determining whether they are employees or whether payments made to them are 'wages' for Federal employment tax purposes.

Rev. Rul. 73-361 (1973).

In *Joseph Radtke, S.C. v. United States*, a district court determined that certain funds designated as dividends were actually compensation for which an S Corporation owed employment taxes. 712 F. Supp. 143 (E.D. Wis. 1989). Radtke, a Wisconsin attorney, had created an S corporation to provide legal services in Milwaukee. *Id*. at 144. Radtke was the firm's sole director, shareholder, and full-time employee, but he took no salary, receiving instead $18,225 in dividend payments from the corporation in 1982. *Id*. Since Radtke received the funds as dividends, rather than as wages, the corporation did not pay employment taxes on them. *Id*. The IRS recharacterized the funds as wages and assessed FICA and other employment taxes

on them, along with penalties and interest. *Id*. at 145. In concluding that the funds were

properly recharacterized as wages rather than dividends, the district court stated:

> I am not moved by the Radtke corporation's connected argument that "dividends" cannot be "wages." Courts reviewing tax questions are obligated to look at the substance, not the form, of the transactions at issue. *Frank Lyon Co. v. United States*, 435 U.S. 561, 573 (1978). Transactions between a closely held corporation and its principals, who may have multiple relationships with the corporation, are subject to particularly careful scrutiny. *Tulia Feedlot, Inc. v. United States*, 513 F.2d 800, 805 (5th Cir. 1975). Whether dividends represent a distribution of profits or instead are compensation for employment is a matter to be determined in view of all the evidence. *Cf. Logan Lumber Co. v. Commissioner*, 365 F.2d 846, 851 (5th Cir. 1966) (examining whether dividends were paid in guise of salaries).

> In the circumstances of this case–where the corporation's only director had the corporation pay himself, the only significant employee, *no* salary for substantial services–I believe that Mr. Radtke's "dividends" were in fact "wages" subject to FICA and FUTA taxation. His "dividends" functioned as remuneration for employment . . . .

> An employer should not be permitted to evade FICA and FUTA by characterizing *all* of an employee's remuneration as something other than "wages." *Cf. Greenlee v. United States*, 87-1 U.S.T.C. ¶ 9306 (corporation's interest-free loans to sole shareholder constituted "wages" for FICA and FUTA where loans were made at shareholder's discretion and he performed substantial services for corporation). This is simply the flip side of those instances in which corporations attempt to disguise profit distributions as salaries for whatever tax benefits that may produce.

*Id*. at 146. Radtke appealed the district court's decision to the Seventh Circuit, which framed the

issue as, "whether, based on the statutes and unusual facts involved, the payments at issue were

made to Mr. Radtke as remuneration for services performed." *Joseph Radtke, S.C. v. United*

*States*, 895 F.2d 1196, 1197 (7th Cir. 1990). "As the district judge determined, these payments

were clearly remuneration for services performed by Radtke and therefore fall within the

statutory and regulatory definitions of wages." *Id*.

Relying on *Radtke* and the Revenue Rulings cited *supra*, the Ninth Circuit has also

determined, in a case remarkably similar to the one at bar, that payments designated as dividends can properly be recharacterized by the IRS as wages subject to federal employment taxes. *See Spicer Accounting, Inc. v. United States*, 918 F.2d 90 (9th Cir. 1990). Spicer, a licensed public accountant, was the president, treasurer, and director of an S Corporation, Spicer Accounting, Inc. *Id*. at 91. Spicer and his wife were the only stockholders in the corporation, and Spicer performed substantial services for the corporation. *Id*. at 91-92. Spicer had an arrangement with the corporation whereby he would "donate his services to the corporation" and "withdraw earnings in the form of dividends." *Id*. at 91. For tax years 1981 and 1982, the IRS recharacterized dividend payments to Spicer by the corporation as wages, and assessed taxes, penalties, and interest against the corporation for unpaid employment taxes. *Id*. The Ninth Circuit affirmed the characterization of payments to Spicer as wages, emphasizing that it is the substance rather than the form of the transaction that matters, and noting that "salary arrangements between closely held corporations and its shareholders warrant close scrutiny." *Id*. at 92. Citing to *Radtke*, the *Spicer* court found that, "regardless of how an employer chooses to characterize payments made to its employees, the true analysis is whether the payments are for remunerations for services rendered." *Id*. at 93. According, "Mr. Spicer's intention of receiving the payments as dividends has no bearing on the tax treatment of these wages." *Id*.

Other courts have reached conclusions like those in *Radtke* and *Spicer*. For instance, in *Veterinary Surgical Consultants v. Commissioner of Internal Revenue*, the United States Tax Court rejected a petitioner's argument that amounts paid to its sole shareholder were distributions of corporate net income rather than wages. 117 T.C. 141, 145 (2001).

Dr. Sadanaga performed substantial services on behalf of petitioner [the S

-14-

corporation]. The characterization of the payment to Dr. Sadanaga as a distribution of petitioner's net income is but a subterfuge for reality; the payment constituted remuneration for services performed by Dr. Sadanaga on behalf of petitioner. An employer cannot avoid Federal employment taxes by characterizing compensation paid to its sole director and shareholder as distributions of the corporation's net income, rather than wages. Regardless of how an employer chooses to characterize payments made to its employees, the true analysis is whether the payments represent remunerations for services rendered.

*Id.* at 145-46. Likewise, in *JD & Associates, Ltd. v. United States*, Jeffrey Dahl, the sole shareholder, officer, and director of the plaintiff S corporation, received an annual salary of $19,000.00 in 1997 and $30,000.00 for each of 1998 and 1999. No. 3:04-cv-59, at 4 (D.N.D. May 19, 2006) (available in Def.'s App. at 146-56). Dahl also received dividends of $47,000.00 for 1997, $50,000.00 for 1998, and $50,000.00 for 1999. *Id.* at 5. As in the present case, the IRS determined that Dahl's salary was unreasonably low, and assessed employment taxes, interest, and penalties against the corporation after recharacterizing portions of the dividend payments as wages to Dahl. *Id.* at 1. Applying an Eighth Circuit test to determine whether Dahl's compensation was reasonable,[6] the district court concluded it was not and upheld the tax assessments against the corporation. *Id.* at 9-11.

---

[6] The test employed was that from *Charles Schneider & Co., Inc. v. Commissioner of Internal Revenue*, wherein the Court stated:

> Several factors to be considered in determining reasonableness of compensation have been mentioned by the courts. Such factors include the employee's qualifications; the nature, extent and scope of the employee's work; the size and complexities of the business; a comparison of salaries paid with the gross income and the net income; the prevailing general economic conditions; comparison of salaries with distributions to stockholders; the prevailing rates of compensation for comparable positions in comparable concerns; the salary policy of the taxpayer as to all employees; and in the case of small corporations with a limited number of officers the amount of compensation paid to the particular employee in previous years.

500 F.2d 148, 182 (8th Cir. 1974).

After careful review of the relevant authorities, the Court agrees with Defendant that DEWPC's self-proclaimed intent to pay Watson $24,000.00 in salary does not limit the United States' ability to recharacterize dividends paid to Watson as wages, even though DEWPC properly documented its claimed intent in its corporate records. Rather, the characterization of funds disbursed by an S corporation to its employees or shareholders turns on an analysis of whether the "payments at issue were made . . . as remuneration for services performed." *Radtke*, 895 F.2d at 1197. This approach conforms with well settled jurisprudence holding that tax consequences are governed by the economic realities of a transaction, not by the form of the transaction or labels given it by the parties. *See, e.g.*, *Boulware v. United States*, 552 U.S. 421, 430 (2008) ("The colorful behavior described in the allegations requires a reminder that tax classifications like 'dividend' and 'return of capital' turn on 'the objective economic realities of a transaction rather than . . . the particular form the parties employed.'") (quoting *Frank Lyon*, 435 U.S. at 573); *Pinson v. Commissioner of Internal Revenue*, T.C. Memo 2000-208 (July 6, 2000) ("As a general rule, the substance of a transaction controls tax treatment." (citing *Gregory v. Helvering*, 293 U.S. 465, 469-70 (1935)); *True v. United States*, 190 F.3d 1165, 1173-74 (10th Cir. 1999) (stating that "substance over form" is a "fundamental tax principle [that] operates to prevent the 'true nature of a transaction from being disguised by mere formalisms, which exist solely to alter tax liabilities'" (quoting *Commissioner v. Court Holding Co.*, 324 U.S. 331 (1945)); *Leisure Dynamics, Inc. v. Commissioner of Internal Revenue*, 494 F.2d 1340, 1345 (8th Cir. 1974) ("For tax purposes, we must concern ourselves with actualities rather than the refinements of title; our concern is with the substance, not form."). This is not to say that intent is insignificant to the analysis. Indeed, a determination of whether funds are "remuneration for

-16-

services performed," must be made "in view of all the evidence," and intent is unquestionably a

consideration in such an analysis.[7]  *Radtke*, 712 F. Supp. at 145.

      Regardless, however, whether intent is the sole factor in determining whether funds are

"remuneration for services performed," or merely one factor to be considered in the totality of

the circumstances, the Court would deny Plaintiff's request for summary judgment on the facts

of this case.  This is because, contrary to Plaintiff's assertion that DEWPC "clearly documented

its intent to pay $24,000 in salary to Watson," consideration of evidence other than corporate

documentation[8] gives rise to an equally reasonable inference that DEWPC structured Watson's

salary and dividend payments in an effort to avoid federal employment taxes, with full

knowledge that dividends paid to Watson were actually "remuneration for services performed."

*See Hunt v. Cromartie*, 526 U.S. 541, 554 (1999) ("Summary judgment in favor of the party with

---

[7] The United States has repeatedly affirmed that it recharacterized dividend payments to Watson as wages based on its determination that Watson's "salary" was unreasonably low under the facts and circumstances of the case.  The United States has also admitted that it does not have any authority to require DEWPC to pay Watson a minimum salary.  Plaintiff would have the Court construe these admissions as evidence supporting Plaintiff's claim that the "United States is simply trying to do indirectly exactly that which it concedes it cannot do directly–require that a corporation pay a minimum amount of compensation or remuneration to a shareholder employee before paying a dividend to that employee."  Pl.'s Reply at 2.  The Court rejects Plaintiff's proposed construction.  Whether Watson's salary was "reasonable" is unquestionably a relevant consideration in determining whether DEWPC's dividend payments to Watson were actually "remuneration for employment."  *See, e.g.*, *Construction & Design Co.*, 563 F.3d at 595-96 ("To limit the ability of shareholder-employees to minimize their salaries and thus the company's employment taxes, the government requires that they be paid "reasonable salaries." (quoting Michael Schlesinger, *Practical Guide to S Corporations* ¶ 102.9, pp. 5-6; ¶ 1302.10, p. 461 (4th ed. 2007)).

[8] For example, the Government has presented undisputed evidence that, amongst other things: Watson was the sole shareholder, employee, director, and officer of DEWPC; Watson had sole check writing authority for DEWPC; Watson determined his own salary; all of DEWPC's income came solely from LWBJ; Watson took interest free loans from DEWPC; and DEWPC paid out dividends totaling approximately 7-8 times Watson's salary for the years in question.

the burden of persuasion, however, is inappropriate when the evidence is susceptible of different interpretations or inferences by the trier of fact.").  Indeed, intent often must be inferred from the totality of the circumstances, as one would hardly expect a corporate entity to thoroughly document an actual intent to avoid federal employment taxes by disguising remuneration as dividends.  *See*, *e.g.*, *Tool Producers, Inc. v. Commissioner of Internal Revenue*, No. 95-2056, 1996 WL 515344, at \*3 (6th Cir. Sept. 10, 1996) ("In determining the intent behind a corporate distribution, we have held that a court should 'look not to mere labels or to the self-serving declarations of the parties, but to more reliable criteria of the circumstances surrounding the transaction.'" (quoting *Jacques v. Commissioner of Internal Revenue*, 935 F.2d 104, 107 (6th Cir. 1991)); *Electric & Neon*, 56 T.C. at 1340 (finding that a corporation may deduct the amount of compensation that it pays so long as it "actually intended" to pay the relevant funds as compensation, but noting that "whether such intent has been shown is, of course, a factual question to be decided on the basis of the particular facts and circumstances of the case"); *Paula*, 58 T.C. at 1058-59 ("It is now settled law that only if payment is made with the intent to compensate is it deductible as compensation.  Whether such intent has been demonstrated is a factual question to be decided on the basis of the particular facts and circumstances of the case." (internal citations omitted)).[9]

---

[9] Plaintiff makes the following additional argument regarding intent in this case:

> The United States cannot dispute [that it never considered intent].  It has candidly admitted that it didn't even consider intent in making the reclassification, but instead looked solely at the 'fair value' of services provided by Watson to [DEWPC].  The sole focus of the United States in this case is on the reasonableness of the compensation.  The United States has not considered intent, has not alleged intent, and has no evidence as to intent.  On this record, [DEWPC] is clearly entitled to summary judgment in its favor.

## IV.  CONCLUSION

In support of its Motion for Summary Judgment, Plaintiff points the Court to the

following oft-cited statement of Judge Learned Hand:

> Over and over again courts have said that there is nothing sinister in so arranging
> one's affairs as to keep taxes as law as possible. Everybody does so, rich or poor; and
> all do right, for nobody owes any public duty to pay more than the law demands:
> taxes are enforced exactions, not voluntary contributions. To demand more in the
> name of morals is mere cant.

*See* Pl.'s Reply Br. at 5 n.2 (quoting *Commissioner of Internal Revenue v. Newman*, 159 F.2d

848, 850-51 (2d Cir. 1947) (L. Hand, J., dissenting)).   While the Court agrees fully with Judge

Learned Hand, it would remind Plaintiff of Justice Oliver Wendell Holmes' succinct, yet equally

---

*Id*. at 5-6.  In making this assertion, Plaintiff references the testimony of the United States'
Designee, Daniel Olson, who testified that, in reaching a conclusion that Watson's salary was set
unreasonably low, "We didn't look to intent.  We looked to the fair value of the services
provided by the shareholder employee to determine the amounts that were subject to Social
Security Tax."  Pl.'s App. at 52 ("Q. So basically, the sole basis for the adjustment is the fact
that you believe his salary was unreasonably low?  A.  Yes.").  Plaintiff further argues in its
Reply Brief that "the United States should not be allowed to belatedly question DEWPC's and
Watson's intent and assert a basis for the assessment that was not properly disclosed to DEWPC
during discovery."  Pl.'s Reply at 6.
　　Given the Court's conclusion that intent is determined from the totality of the
circumstances, and that intent is but one factor to be considered in characterizing corporate
distributions to Watson as either dividends or wages, the Court finds Plaintiff's arguments in this
regard to be utterly without merit for several reasons.  First, the arguments fail because they turn
on Plaintiff's now-rejected position that DEWPC's subjective intent solely controls how funds
paid to Watson should be characterized.  Second, Plaintiff's contention that Defendant did not
consider intent at all is belied by Olson's testimony stating that Defendant "believed that the
primary reason for setting the salary at $24,000 was to minimize Social Security tax."  Def.'s
App. at 4.  Finally, Defendant specifically denied Plaintiff's contention in its Statement of
Material Facts that it "did not look to the intent" of DEWPC.  *See* Pl.'s Facts ¶ 20.  Indeed, the
Court fully agrees with Defendant's further reply in support of its denial:  "Simply because the
United States did not *base its adjustment* on intent, that does not mean the United States did not
*consider or examine* Watson's intent prior to making its adjustment, it just reached a different
conclusion about intent than DEWPC would have the Court reach."  Def.'s Response to Facts ¶
20.

eloquent statement in *Compania General de Tabacos de Filipinas v. Collector of Internal Revenue*:  "Taxes are what we pay for civilized society."  275 U.S. 87, 100 (1927) (Holmes, J., dissenting).  Indeed, "the greatness of our nation is in no small part due to the willingness of our citizens to honestly and fairly participate in our tax collection system."  *Manley v. Commissioner of Internal Revenue*, T.C. Memo 1983-558 (Sept. 12, 1983).  Thus, while Plaintiff is free to structure its financial affairs in such a way as to avoid paying "more [taxes] than the law demands," Plaintiff is not free to structure its financial affairs in a way that avoids paying those taxes demanded by the law.  In this case, the law demands that Plaintiff pay employment taxes on "all remuneration for employment," and there is clearly a genuine issue of material fact as to whether the funds paid to Watson, in actuality, qualify as such.  Accordingly, for the reasons stated herein, Plaintiff's Motion for Summary Judgment (Clerk's No. 13) is DENIED.

IT IS SO ORDERED.

Dated this ___27th___ day of May, 2010.


_____
ROBERT W. PRATT, Chief Judge
U.S. DISTRICT COURT