IN THE UNITED STATES DISTRICT COURT FOR THE
SOUTHERN DISTRICT OF IOWA
CENTRAL DIVISION

DAVID E. WATSON, P.C.                )
                                     )
              Plaintiff,             )
                                     )
      v.                             )        Civil No. 4:08-CV-00442-RP-CFB
                                     )
UNITED STATES OF AMERICA             )
                                     )
              Defendant.             )

---

## Order

---

Based on the evidence presented at trial, the Court makes the following findings of

fact and conclusions of law and enters the following order.

### Findings of Fact

### Background

1.    The current action concerns employment taxes, with concomitant interest

      and penalties, assessed against David E. Watson, P.C. ("Watson PC) on the

      salary it paid to David E. Watson, its sole shareholder, officer, and director,

      for 2002 and 2003.

2.    Watson P.C. brought this action seeking a refund of $4,063.93 which it paid

      for the fourth quarter of 2002.

3.    The United States filed an answer and counterclaim, denying Watson's P.C.

      claim for the fourth quarter of 2002 and claiming $44,457.39 for additional

tax assessments for all quarters of 2002 and 2003. The assessments were based on the theory that Watson PC paid unreasonably low wages to Watson while simultaneously paying out large dividends to its sole shareholder, David Watson.

### Facts Pertaining to David Watson and Watson, P.C.

4.  Watson received a bachelors degree in business administration with a specialization in accounting from the University of Iowa in 1982.

5.  Watson became a Certified Public Accountant in 1983, and received a masters degree in taxation from Drake University in 1993.

6.  Between 1982 and 1992, Watson practiced accounting at two different accounting firms, one of which was Ernst & Young, where Watson began specializing in partnership taxation.

7.  During his years at Ernst & Young, Watson's salary ranged from a low of $21,635 to a high of $45,979; only in his first year at Ernst & Young did Watson earn less than $24,000.

8.  After leaving Ernst & Young, Watson left to became a twenty-five percent shareholder in an accounting firm called Larson, Watson, Bartling & Eastman, P.C. (The "Larson Partnership").

9.  In 1996, Watson incorporated Watson PC and caused Watson PC to become a 25% partner in the Larson Partnership.

10.   Watson PC also entered into an employment agreement with the Larson Partnership.

11.   Under the terms of the employment agreement, Watson became Watson PC's employee and agreed to provide his accounting services exclusively to the Larson Partnership.

12.   In 2002 and 2003, Watson could not practice accounting other than through the Larson Partnership.

13.   Watson advertises himself on the Internet as having "significant experience in the taxation of S-corporations."

14.   Watson is Watson PC's only officer, only shareholder, only director, and only employee.

15.   Watson is the only person who has ever been an officer, shareholder, director, or employee of Watson PC.

16.   Watson is the only person to whom Watson PC  distributed money in 2002 or 2003.

17.   Watson had complete control over how much money flowed to him from the Larson Partnership through Watson PC  as salary and how much of that money flowed through to him as a dividend, and was able to take interest-free loans from Watson PC.

18.   Watson PC has one checking account, and Watson is the only person authorized to sign checks on that account.

19.   In 2002 and 2003, Watson received $24,000 designated as salary from Watson PC and paid employment taxes on that amount.

20.   At shareholder meetings he held with himself in 2000, 2001 and 2002, Watson authorized himself to be paid a salary of $24,000 in 2001, 2002 and 2003.

21.   In addition to the $24,000 salary, Watson received approximately $203,000 from the Larson Partnership in 2002 in the form of dividends from Watson PC.

22.   Watson received this $203,000 in twenty-four installments during 2002, eighteen of which were for exactly $5,000.

23.   In 2003, Watson received $24,000 in self-described salary plus $231,577 from the Larson Partnership in the form of dividends from Watson PC.

24.   In both 2002 and 2003, Watson worked for the benefit of the Larson Partnership an average of 35 to 45 hours a week for about 46 weeks of the year.

25.   Watson's $24,000 salary is less than the average $42,243 starting salary for a 2002 or 2003 accounting graduate from the University of Iowa.

26.   Watson's salary was also $2,000 *lower* than the *lowest* starting salary for a 2003 University of Iowa accounting graduate, which was $26,000 for 2002.

27. In setting his salary, Watson did no research other than to talk to the other Larson partners to reach an agreement on what salary they would each pay themselves.

28. As a CPA and a return preparer, Watson is familiar with IRS Circular 230, which, among other things, prohibits return preparers from taking a position on a return unless it has a realistic possibility of being sustained on its merits.

29. As a CPA and a return preparer, Watson also knows that the IRS can assess penalties against preparers under certain circumstances.

30. Watson testified that when he set his $24,000 salary for 2002 and 2003, he was only "vaguely familiar" with court cases discussing reasonable compensation for S-corp officers.

31. Watson testified that his $24,000 salary was reasonable, that a $5,000 salary would have been reasonable, but that a one-cent salary would have been unreasonable, but could not explain why.

32. Watson's testimony that his $24,000 salary was based on the minimum amount he and his partners anticipated earning in 2002 and 2003 was not credible given that Watson PC and the Larson Partnership were significantly more profitable that comparable accounting firms in Iowa.

**Facts Pertaining to United States Expert Witness Igor Ostrovsky**

33.  The United States offered expert testimony on whether Watson's compensation was reasonable in comparison to other similarly situated businesses through Igor Ostrovsky, a valuation engineer with the IRS and a Accredited Valuation Analyst.

34.  As an evaluation engineer with the IRS, Ostrovsky has assisted in IRS audits by analyzing the compensation of taxpayers who operate Schedule C corporations and pay excessive wages to employees in order to claim unreasonable large salary deductions to avoid paying tax.

35.  As an evaluation engineer with the IRS, Ostrovsky has also assisted in IRS audits by analyzing the compensation of taxpayers who operate S-corporations and pay themselves unreasonable low wages in order to avoid paying FICA tax on the wages.

36.  Ostrovsky has previously testified as a expert witness on compensation in federal district court, and was the United States' expert witness in *JD & Associates, Ltd. v. United States*, No. 3:04-cv-59 (D. N.D. May 19, 2006), which held on remarkably similar facts that an accountant operating an S-corporation paid himself an unreasonably low wage.

37.  Ostrovsky offered the expert opinion that the fair market value of Watson's accounting services in 2002 and 2003 was $91,044.

38.     In reaching this opinion, Ostrovsky first determined, based on peer group financial data including a national survey of financial ratios published by Risk Management Associates and the Leo Troy's Almanac that are generally relied upon and used by persons in his field, that Watson PC and the Larson Partnership were significantly more profitable than other similarly-sized Iowa accounting firms during 2002 and 2003.

39.     Based on this data, Ostrovsky reasonably concluded that as a significantly profitable firm, Watson PC could pay Watson a salary greater than $24,000 a year.

40.     In offering an opinion as to the fair market value of Watson's services in 2002 and 2003, Ostrovsky relied on salary figures for recent accounting graduates in Iowa for 2002 from the University of Iowa and the National Association of Colleges and Employers, which data is generally relied upon by persons in his field.

41.     Ostrovsky testified that in 2002, Watson paid himself significantly less than average recent accounting graduation from the University of Iowa, who received an average starting salary of $42,243.

42.     Ostrovsky also testified that in 2002, Watson paid himself $2,000 *less* than the lowest reported salary for a University of Iowa graduate in accounting, which was $26,000.

43.  Because Watson is a CPA with many years of accounting experience and has duties akin to a partner at an accounting firm, Ostrovsky considered compensation data for accountants set forth provided by Robert Half and the Managerial Accounting Survey (the MAP survey), which are generally relied upon and used by persons in his field.

44.  By using the average hourly rate for a similarly-situated accountant as set forth in the MAP survey, Ostrovsky offered an opinion that Watson's yearly compensation should have been $93,286.

45.  Because this figure, which is based on the MAP survey, includes non-taxable fringe benefits that are not subject to employment tax, Ostrovsky used data from the Leo Troy Almanac to eliminate $2,242 in non-taxable fringe benefits from Watson's compensation.

46.  After eliminating $2,242 in non-taxable fringe benefits from Watson's compensation, Ostrovsky testified that the fair market value of Watson's accounting services in 2002 and 2003 was $91,044.

47.  Ostrovsky testified that his expert opinion that the fair market value of Watson's services was $91,044 was a conservative estimate.

48.  The Court gives great weight to Ostrovsky's testimony, which was credible and based on reliable principles and methods of determining the fair market value for services.

## Conclusions of Law

49.    Watson PC bears the burden of demonstrating that the IRS assessments

were incorrect and also what the correct assessments should be. See, e.g., *IA*

*80 Group, Inc. v. United States*, 347 F.3d 1067, 1071 (8th Cir. 2003) (citing

*United States v. Pfister*, 205 F.2d 538, 542 (8th Cir. 1953)).  Watson PC

also bears the burden in demonstrating that the compensation paid was

reasonable. *RTS Investment Corp. v. Commissioner*, 877 F.2d 647, 650 (8th

Cir. 1989).

50.    The United States has defended the suit using a different methodology than

it used in its initial assessment of tax liability. The government is free to use

divergent methodology if it supports the original assessment. *Blansett v.*

*United States*, 283 F.2d 474, 478 (8th Cir. 1960).

51.    The United States' use of a different methodology than it used in its original

assessment does not shift the burden from Watson PC to the United States.

*Blansett*, 283 F.2d at 478; *King v. United States*, 641 F.2d 253, 258-59 (5th

Cir. 1981); *See generally Spangler v. Commissioner*, 278 F.2d 665 (4th Cir.

1960); *Sidney v. Commissioner*, 273 F.2d 928 (2d Cir. 1960).

## Reasonableness of Compensation

52.    Tax consequences are governed by the economic realities of a transaction,

not by the form of the transaction or labels given it by the parties. *See, e.g.,*

*Boulware v. United States*, 552 U.S. 421, 430 (2008).

53. The incentive for S corporations to distort the actual character of

payments to its shareholders/employees to obtain a tax advantage was

recently articulated by Judge Richard A. Posner:

> The distinction between accounting profits, losses, assets, and
> liabilities, on the one hand and cash flow on the other is especially
> important when one is dealing with either a firm undergoing
> reorganization in bankruptcy or a small privately held firm;
> in the latter case, in order to avoid double taxation (corporate income
> tax plus personal income tax on dividends), the company might try to
> make its profits disappear into officers' salaries. See *Menard, Inc. v.*
> *Commissioner*, 560 F.3d 620, 621 (7th Cir. 2009). The owners of a
> Subchapter S corporation, however, have the oppositive incentive–to
> alchemize salary into earnings. A corporation has to pay
> employment taxes, such as state unemployment insurance tax and
> social security tax, on the salaries it pays. A Subchapter S
> corporation can avoid paying them by recharacterizing salary as a
> distribution of corporation income. *Constr. & Design Co. v. United*
> *States Citizenship & Immigration Servs.*, 563 F.3d 593, 595-96 (7th
> Cir. 2009).

54. Watson PC's self-proclaimed intent to pay Watson $24,000.00 in salary

does not limit the United States' ability to recharacterize dividends paid to

Watson as wages, even though Watson PC properly documented its claimed

intent in its corporate records. Rather, the characterization of funds

disbursed by an S corporation to its employees or shareholders turns on an

analysis of whether the "payments at issue were made. . . as remuneration

for services performed." *Joseph Radtke, S.C. v. United States*, 895 F.2d

1196, 1197 (7th Cir.1990); *Spicer Accounting, Inc. v. United States*, 918

F.2d 90 (9th Cir.1990) (determining that dividend payments to accountant were in fact wages for federal tax purposes).

55.   The Eighth Circuit has set forth several factors for the Court to consider in determining the reasonableness of compensation with no single factor being dispositive.

56.   The reasonableness test encompasses nine factors, some of which may be inapplicable or unsuitable given the particular context of the case. These factors are (1) employee qualifications; (2) the nature, extent, and scope of the employee's work; (3) the size and complexity of the business; (4) prevailing general economic conditions; (5) the employee's compensation as a percentage of gross and net income; (6) the employee-shareholder's compensation compared with distributions to shareholders; (7) the employee-shareholder's compensation compared with that paid to non-shareholder-employees or paid in prior years; (8) prevailing rates of compensation for comparable positions in comparable concerns; and (9) comparison of compensation paid to a particular shareholder-employee in previous years where the corporation where the corporation has a limited number of officers. *Charles Schneider & Co. v. Commissioner*, 500 F.2d 148, 182 (8th Cir. 1974).

57.   The above test is adequately reflected in *Trucks, Inc. v. United States*, 588 F. Supp 638  (D. Neb. 1984). There, the court utilized the above factors,

- 11 -

grouping them into three broader categories for ease in analysis and discussion. These categories were (1) performance of the employee, (2) salary comparisons, and (3) company conditions. This Court shall proceed in the same manner. It is worthy to note that the facts relevant to each particular category do not exist in isolation, but are intertwined, and often complementary.

58.    In examining the first category, this Court concludes that Watson's performance as head of Watson PC was exemplary. Watson is a prominent accountant in Des Moines, Iowa.  His firm boasted profits far in excess of the profits generated by comparable accounting firms. A reasonable director or chief executive officer who was hired and retained pursuant to arms length negotiation would expect to be compensated to a degree that matched his or her performance. Here, Watson's compensation is not congruent to his performance.

59.    A comparison of salaries also reveals that Watson's salary was unreasonable. Watson, a CPA with over two decades of accounting experience, paid himself less than the average starting salary for a graduate and less than the lowest starting salary of a recent University of Iowa accounting graduate.  Watson also paid himself significantly less than did other comparable accountants based on Ostrovsky's testimony.  These factors weigh against a finding of reasonableness.

60.  The conditions of the company would dictate greater pay to its chief executive.  Watson PC and the Larson Partnership were significantly more profitable than similar-sized accounting firms and thus had significant capital available for Watson's salary.  The profitability of both Watson PC and the Larson Partnership would allow for a salary higher than that which Watson received.

61.  In applying the Eighth Circuit's multi-factored test for reasonableness of compensation, broadly grouped into the three categories articulated by the court in *Trucks*, the $24,000 compensation paid to Watson was not reasonable.

62.  Watson PC structured Watson's salary and dividend payments in an effort to avoid federal employment taxes by alchemizing salary into earnings (dividends), with full knowledge that dividends paid to Watson were actually "remuneration for services performed."

### Reasonableness of the United States' Methodology

63.  The $91,044 salary figure for 2002 and 2003, offered through the United States' expert witness, Ostrovsky, is a reasonably salary for the 2002 and 2003 years.

64.  The $91,044 salary figure is lower than that on which the assessments in the counterclaim are based.  However, the United States has defended the suit using a different methodology than it used in its initial assessment of tax

liability, and the United States' methodology, as presented at trial, is reasonable.

## Order

65.   Watson's $24,000 salary for 2002 and 2003 was unreasonable and Watson PC takes nothing on its claim for refund for the fourth quarter of 2002.

66.   The United States has prevailed on its counterclaim that Watson's PC should have paid Watson a salary of at least $91,044 for 2002 and 2003.

67.   The parties shall submit an agreed judgment based on Court's findings and conclusions of law within 30 days of the entry of this Order.

IT IS SO ORDERED.

Dated this ___ day of October, 2010.

_____
ROBERT W. PRATT, Chief Judge
U.S. DISTRICT COURT

## CERTIFICATE OF SERVICE

IT IS HEREBY CERTIFIED that on September 27, 2010, the foregoing **United States' Proposed Findings of Facts, Conclusions of Law, and Order** has been filed via the Court's ECF system, which will provide electronic notice to the following:

Ronald L. Mountsier, Esq.
Smith, Schneider, Stiles & Serangeli, P.C.
604 Locust St., Ste. 1000
Des Moines IA 50309-3715


*s/Michael R. Pahl*
Michael R. Pahl
Trial Attorney, Tax Division
U.S. Department of justice