IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF IOWA
CENTRAL  DIVISION

| | | |
|---|---|---|
| DAVID E. WATSON, P.C, | * | |
| | * | 4:08-cv-442 |
| Plaintiff, | * | |
| | * | |
| v. | * | |
| | * | |
| UNITED STATES OF AMERICA, | * | |
| | * | ORDER ON BENCH TRIAL |
| Defendant. | * | |
| | * | |

On or about February 5, 2007, the United States of America ("Defendant" or
"Government") recharacterized dividend and loan payments from David E. Watson, P.C.
("DEWPC" or "Plaintiff") to its sole shareholder and employee, David E. Watson ("Watson"), as
wages.  Compl. (Clerk's No. 1) ¶ 10.  In light of this recharacterization, Defendant assessed
additional employment taxes, interest and penalties against Plaintiff for each of the eight
calendar quarters in 2002 and 2003.  *Id.*  DEWPC paid the fourth quarter 2002 assessment of
$4,063.93 on or about April 14, 2007 and filed a claim for refund of that amount on or about
June 27, 2007.  *Id.* ¶¶ 12-13.  Defendant denied Plaintiff's request for a refund on or about
November 16, 2007.  *Id.*  ¶ 14.

Plaintiff filed the above-captioned action on October 31, 2008, contending that the
assessments against it were illegal, and requesting a refund of the amount paid.  *Id.* ¶ 3.
Defendant filed an Answer and Counterclaim on February 12, 2009 (Clerk's No. 6), resisting
Plaintiff's request for refund, and requesting Judgment against Plaintiff in the amount of
$44,457.39 for additional assessments, penalties, and interest for the seven additional quarters in
2002 and 2003 for which Plaintiff did not make payment.  The Court held a bench trial in the

case on August 27, 2010. Clerk's No. 29. On September 27, 2010, the parties submitted

proposed findings of fact and conclusions of law. Clerk's Nos. 33-34. The matter is fully

submitted.

## I. CONSIDERATIONS ON REVIEW

Federal Rule of Civil Procedure 52(a) requires that in all cases tried without a jury or

with an advisory jury, "the court shall find the facts specially and state separately its conclusions

of law thereon." In determining the credibility of the witnesses and the weight to be accorded

their testimony, the Court has taken into consideration: the character of the witnesses, their

demeanor on the stand, their interest, if any, in the result of the trial, their relation to or feeling

toward the parties to the trial, the probability or improbability of their statements as well as all

the other facts and circumstances given in evidence. *Clark v. United States*, 391 F.2d 57, 60 (8th

Cir. 1968). With these considerations in mind, the Court finds facts and makes conclusions of

law as articulated herein.

## II. FINDINGS OF FACT

### A. *Stipulated Facts*

The parties have stipulated to many of facts in this case. *See* Stip. Facts in Final Pretrial

Order at 2-5 (Clerk's No. 19). Pursuant to the parties' stipulation, the Court finds the following

facts in this case:

- David Watson ("Watson") graduated from the University of Iowa in 1982, with a
  bachelor's degree in business administration and a specialization in accounting. Stip.
  Fact ¶ L.

- Watson became a Certified Public Accountant ("CPA") in 1983, and received a master's
  degree in taxation from Drake University in 1993. *Id*. ¶ M.

- Between 1982 and 1992, Watson practiced accounting at two different accounting firms, one of which was Ernst & Young, where he began specializing in partnership taxation. *Id*. ¶ N.

- After leaving Ernst & Young, Watson became a 25% shareholder in an accounting firm called Larson, Watson, Bartling & Eastman ("LWBE"). *Id*. ¶ O.

- The remaining 75% of LWBE was owned by Tom Larson, Jeff Bartling, and Dale Eastman. Stip. Facts. ¶ P.

- On October 11, 1996, Watson incorporated DEWPC, an Iowa Professional Corporation. *Id*. ¶¶ A, Q.

- DEWPC is a validly organized and existing corporation, properly recognized as a separate entity for federal tax purposes. *Id*. ¶ B.

- Watson, at the times relevant to this action, and at all times generally, is the only individual who is or has ever been an officer, shareholder, director, or employee of DEWPC. *Id*. ¶¶ C, E, U, V.

- Watson's employment with DEWPC was, at all relevant times, governed by the terms and conditions of an Employment Agreement. *Id*. ¶ D.

- DEWPC has elected to be taxed as an S Corporation since the time of its inception. *Id*. ¶ I.

- After incorporating DEWPC in 1996, Watson caused DEWPC to become a 25% shareholder in LWBE, replacing Watson's own, individual shareholder status in DEWPC. *Id*. ¶ Q.

- The other partners in LWBE undertook similar action, such that LWBE became owned by DEWPC, Thomas E. Larson, P.C., Jeffrey T. Bartling, P.C., and Dale A. Eastman, P.C., rather than by Watson, Larson, Bartling, and Eastman individually. *Id*. ¶ R.

- By 1998, Paul Juffer, P.C. had become a partner and Dale A. Eastman, P.C. had ceased being a partner, such that LWBE changed its name to Larson, Watson, Bartling, & Juffer, LLP ("LWBJ"). *Id*. ¶ S. DEWPC remained a partner in LWBJ after the name change. *Id*. ¶ G.

- Watson is not personally a partner or employee of LWBJ; rather, he provides accounting services to LWBJ and its clients as an employee of DEWPC. *Id*. ¶¶ H, J, K.

- In the relevant years, 2002 and 2003, Watson could not practice accounting other than

through LWBJ.[1] *Id.* ¶ F.

• In 2002 and 2003, Watson received $24,000 designated as salary from DEWPC and paid employment taxes on that amount. *Id.* ¶ W.

• DEWPC's 2002 and 2003 cash income came exclusively in the form of distributions from LWBJ. *Id.* ¶ AA.

• Watson is the only person to whom DEWPC distributed money in 2002 or 2003. *Id.* ¶ X.

• There is no tax statute, regulation, or other rule that requires DEWPC to pay any minimum salary to Watson. *Id.* ¶ Y.

• There is no minimum amount of compensation that DEWPC was required to pay to Watson before it could declare and pay a dividend to Watson. *Id.* ¶ Z.

• On or about April 14, 2007, the United States received a payment of $4,063.93 from DEWPC, representing additional tax and related penalty and interest assessments made against DEWPC by the United States for the calendar quarter ending December 31, 2002. *Id.* ¶¶ BB, EE.

• Though DEWPC designated that the payment of $4,063.93 be applied to the tax liability for the fourth quarter of 2002, the IRS erroneously applied the payment to the first quarter of 2002. *Id.* ¶¶ CC-DD.

• The parties agree that the erroneous application of Plaintiff's tax payment to the first quarter of 2002, rather than the fourth quarter of 2002, does not operate to deprive this Court of subject-matter jurisdiction. *Id.* ¶¶ FF-GG.

## B. *Additional Findings of Fact*

Though the facts to follow were not stipulated to by the parties, the Court finds that they have been amply proven or established by evidence and testimony at trial.

### 1. *David Watson.*

• DEWPC regularly held shareholder meetings, at which Watson (DEWPC's only shareholder, employee, and officer) was the only participant. *See* Exs. 5-9, 18-19.

---

[1] The accounting work that Watson performed did not change significantly after LWBE became LWBJ. Stip. Facts. ¶ T.

- Watson testified that, when LWBE first started, he received zero salary due to the start-up nature of the company. Tr. at 18-19.[2]

- At the October 6, 1997 shareholder meeting, DEWPC authorized an annual salary for Watson of $12,000 for 1998. Ex. 8. DEWPC also approved payment to Watson of "dividends in the amount of available cash on hand after payment of compensation and other expenses of the corporation." *Id.*

- Watson testified that the partners agreed to a $12,000 annual salary for each in 1998 because "we had determined as a group that, as a minimum, we should have enough cash flow on hand in any given period to pay $1,000 a month to each partner, whether it was good times or bad." Tr. at 28.

- At the October 2, 2000 shareholder meeting, DEWPC authorized an annual salary for Watson of $24,000 for 2001. Ex. 19. DEWPC also approved payment to Watson of "dividends in the amount of available cash on hand after payment of compensation and other expenses of the corporation." *Id.*

- DEWPC approved the same salary and dividend arrangement with respect to Watson ($24,000 salary plus dividends) at its October 1, 2001, October 7, 2002, and October 6, 2003 shareholder meetings. Exs. 5-7.

- Watson testified at trial that the reason his compensation was set at $24,000 for the years 2002 and 2003 was because the partners of LWBJ "got together and discussed what we felt that we could pay on a regular and continuous basis regardless of the seasonability of our business." Tr. at 24. Watson further testified that the partners agreed that "regardless of whether it's a good economy or bad economy . . . we felt that we'd grown to the point that, for each of the partners, that we could pay $2,000 a month for sure and then we'd have that cash available." *Id.* at 24-25.

- Watson testified that his salary for the last several years (post-dating the tax years at issue in this case) has been $48,000, again because the partners of LWBJ agreed that the business' cash flow was sufficient to pay a "minium of $4,000 per month whether it was good times or bad." Tr. at 28.

- LWBJ maintained a "co-employer" relationship with Merit Resources, whereby twice a month, LWBJ submits funds to Merit Resources, and Merit Resources sends out payroll checks after accounting for relevant deductions. *Id.* at 28-29. Hence, Watson's paychecks and W-2s are issued by Merit Resources. *Id.* at 29.

---

[2]   References to the transcript are to the unedited RealTime Transcript provided to the Court by the reporter.

- The gross revenues of LWBJ for 2002 were $2,349,556, and the gross revenues for LWBJ for 2003 were $2,949.739. Exs. 12-13; Tr. at 30.

- Watson's gross billings to clients were approximately $197,682.21 in 2002, and $200,380.36 in 2003. Exs. 14-15; Tr. at 31.

- Watson testified that LWBJ has approximately 30 employees, and that approximately 26-27 of those employees bill time to clients. Tr. at 33.

- Watson further testified that the partners of LWBJ incur substantially more of the expenses of the firm than any other employees, due to larger officers, more travel, and greater educational costs. *Id*. at 32-33.

- Watson testified that there are adverse effects of setting his salary at $24,000 annually for the relevant years, including lesser 401(k) contributions and matching, and lower Social Security contributions. *Id*. at 34-35.

- Watson testified that when he set his salary at $24,000, he was not concerned that he was doing any thing improper with regard to the payment of employment taxes because:  1) the salary was set for a business purpose; and 2) because the partners were "vaguely familiar" with case law where S corporation and C corporation distributions were recharacterized, but did not believe such case law was applicable to LWBJ because of differing fact patterns. *Id*. at 35-37.

- Watson, through DEWPC, received profit distributions from LWBJ totaling $203,651 for 2002. Ex. 21 at 19-20; Tr. at 41-42.  Specifically, Watson received profit distributions of $36,151 during the first quarter of 2002; $55,000 during the second quarter of 2002; $26,500 during the third quarter of 2002; and $86,000 during the fourth quarter of 2002. Ex. 21 at 20; Tr. at 46-49.

- Watson, through DEWPC, received profit distributions from LWBJ totaling approximately $175,470, with payments totaling $43,867.50 in each of the four quarters of 2003. Ex. 32.

- Watson is an experienced and successful Certified Public Accountant, and has advertised on the internet as having "significant experience in the taxation of S corporations." Tr. at 59-61.

- Watson has taught in Drake University's MBA program and keeps up on developments in the tax law. *Id*. at 64.

- Watson is aware of IRS Circular 230, which provides that return preparers cannot take a position on a tax return unless there is a realistic possibility of the position being

sustained on its merits.  *Id*. at 65.

- LWBJ routinely advises S corporations on taxation issues.  *Id*. at 63.

- Payment of a lower wage results in the payee owing less employment ("FICA") taxes. *Id*. at 63-64.

- Watson has no documents reflecting conversations with other members of LWBJ regarding setting salaries, and no other members of LWBJ testified on the matter at trial. *Id*. at 66-67.

- Watson and the other partners of LWBJ did not "research the tax issues" when they put the structure of LWBJ together.  *Id*. at 69.

- Watson testified that he and the other LWBJ partners did not raise their salaries to $48,000 in 2007 as a result of being audited on August 25, 2006, and did not consider factors identified in case law as relevant to setting salaries due to the different factual settings in the case law.  *Id*. at 75-76.

- Watson testified that when setting his salary, he did not look at what comparable business paid for similar services.  *Id*. at 80.

- Watson maintained at trial that the IRS has no authority whatsoever to reclassify dividends as wages in a situation where $12,000 or $5,000 in wages were paid, but agreed that a salary of a penny could be reclassified.  *Id*. at 80-81.

- Watson was not surprised to discover that he was paying himself less salary than that typically made by a recent college graduate in accounting.  *Id*. at 84.

- Watson testified that he would not hire himself out to someone else for $24,000 per year without having ownership in the business.  *Id*. at 84.

- Watson testified that he is aware that the IRS has taken a public position that S Corporation employees must be paid reasonable compensation, but does not believe that there is statutory authority to support the IRS's position that wages must be reasonable. *Id*. at 88-90.

    2.    *Igor Ostrovsky*.

- Igor Ostrovsky is a general engineer[3] for the IRS, who offered testimony at trial

_____

[3] Ostrovsky testified that a general engineer for the IRS serves acts as a consultant on audits, and assists revenue agents in the valuation of businesses, depreciation, tangible and intangible assets,

regarding the fair market value of Watson's accounting services in 2002 and 2003.  Tr. at 93.

- Ostrovsky holds bachelor of science degrees in electrical engineering and mathematics and a Masters of Business Administration with concentration in finance, all from the University of Minnesota.  *Id*. at 95.

- Ostrovsky has acted as an expert for the IRS in evaluating the reasonableness of taxpayer compensation on an estimated 20-30 cases.  *Id*. at 95-96.

- Ostrovsky has made presentations regarding issues of reasonable compensation in his role as an engineer with the IRS.  *Id*. at 98.

- Ostrovsky has testified three times in court on issues of reasonable compensation.  *Id*. at 99.

- Ostrovsky is a member of the National Association of Certified Valuation Analysts.  *Id*. at 101.

- Ostrovsky testified that he did not share his expert report with anyone at the IRS and that no one at the IRS attempted to influence his testimony in any way.  *Id*. at 101.

- Ostrovsky is competent to render an expert opinion regarding the fair market value of Watson's accounting services, and is qualified as an independent expert in the field of compensation, specializing in the fair market value of S corporations and other corporate entities, based on his experience training, and education.  *Id*. at 105.

- Ostrovsky's expert opinion is that for the years 2002 and 2003, the fair market value of Watson's accounting services to DEWPC and LWBJ were $91,044 per year.  *Id*. at 106.

- In reaching his opinion, Ostrovsky evaluated the financial performance of both Watson and LWBJ.  *Id*. at 109.

- Relying on the Risk Management Association ("RMA") annual statement studies Ostrovsky opined that DEWPC was "significantly more profitable than comparably sized firms, accounting firms, and they were as much as ten times more profitable than comparable firms," and that  LWBJ was "at least three times more profitable than comparably sized firms in the[] accounting field."  *Id*. at 110.

- Ostrovsky also found that the Leo Troy Almanac of Business and Industrial Financial Ratios, which contains tax return data on all C and S corporations, supports a conclusion

and reasonable compensation, amongst other things.  Tr. at 95.

that DEWPC was "considerably more profitable than its peers" and that LWBJ "was at least twice as profitable as [its] peers." *Id*. at 112.

• Ostrovsky additionally looked at information relating to compensation for accountants in rendering his expert opinion. *Id*. at 112.

• Relying on a survey published by the University of Iowa regarding starting salaries for new accounting graduates, Ostrovsky opined that Watson's salary of $24,000 was lower than: 1) the median reported starting salary for new graduates in 2002 ($40,000); 2) the median reported starting salary for new graduates in 2003 (just under $40,000); and 3) the minimum reported offer for an accounting graduate in 2002 ($26,000). *Id*. at 113, 131.

• Using compensation data from Robert Half International, a placement agency for individuals in accounting and finance, Ostrovsky determined that compensation for individuals in positions subordinate to that of Watson was significantly higher than the compensation Watson claimed in 2002 and 2003. *Id*. at 114. In reaching this conclusion, Ostrovsky deemed Watson, an individual with approximately 20 years of accounting experience as akin to a director/manager, defined by the Half survey as a person with 11-plus years of experience. *Id*. Persons in positions of lesser experience to that of the director/manager position had a range of compensation in 2002 from between the "middle sixties to almost $90,000." *Id*. Ostrovsky made adjustments to account for region and education. *Id*. at 114-15.

• Ostrovsky also relied on the portion of the Management of an Accounting Practice ("MAP") survey, conducted by the American Institute of Certified Public Accountants, relevant specifically to the Iowa Society of CPAs. Tr. at 116. The MAP survey indicated that an average "owner" (defined as both an investor in and an employee of a firm) in a firm the size of LWBJ would receive approximate $176,000 annually, reflecting both compensation and return on investment. *Id*. at 117-18. A director (defined as solely an employee with no investment interest) would realize approximately $70,000 compensation annually. *Id*. at 118.

• To properly determine a comparable salary for Watson, free of "return on investment," Ostrovsky evaluated billing rates for owners and directors and found that owners billed at a rate approximately 33% higher than did a director. *Id*. at 119. Accordingly, Ostrovsky increased the director's estimated compensation by 33% to obtain an estimated comparable salary for someone in Watson's position of approximately $93,000. *Id*. at 119-20. Ostrovsky then reduced this amount to $91,044 to account for certain untaxable fringe benefits. *Id*. at 120.

• Ostrovsky believes his estimate, providing that reasonable compensation for Watson would have been approximately $91,044 for each of 2002 and 2003, to be an "extremely

conservative determination." *Id*. at 120.

• Ostrovsky concedes that part of the reason LWBJ appears more profitable than its comparators is because it pays lower salaries. *Id*. at 129-30. Ostrovsky did not evaluate how LWBJ or DEWPC's profitability would look *after* the recharacterization of dividends as wages. *Id*.

• Ostrovsky's opinion changed over time as he became aware of more facts regarding Watson's engagement with DEWPC and LWBJ following Watson's deposition, and as he identified some errors in his initial calculations. *Id*. at 133-37.

• Ostrovsky's opinion is based on analyzing Watson as a de facto partner in LWBJ, not based on his status in relation to the smaller DEWPC. *Id*. at 151.

• Ostrovsky's opinion of the fair market value of Watson's services was based on an average billing rate, rather than on Watson's actual billing rate. *Id*. at 158.

3.    *Daniel Olson*.

• Daniel Olson testified via deposition designations.

• Olson testified that the amount of compensation properly paid to Watson would be determined the same regardless of whether DEWPC had S or C corporation status. Dep. at 6.

• Olson testified that the United States does not take the position that any special rules are applicable to DEWPC or to Watson, or that there is any tax, statute, regulation, or other rule that would require DEWPC to pay Watson any minimum amount of compensation. *Id*. at 6.

• Olson testified that the sole basis for Defendant's position that portions of the 2002 and 2003 dividend payments to Watson should be recharacterized as wages is Defendant's belief that DEWPC paid Watson an unreasonably low salary. *Id*. at 7, 36.

• Olson testified that the Defendant does not contend that DEWPC failed to properly authorize loans or dividend payments to Watson. *Id*. at 8.

• Olson testified that the Defendant does not contend that there is any minimum amount of compensation that DEWPC must pay Watson before it can pay him dividends; rather, Defendant contends only that FICA taxes be paid on the fair value of services provided by Watson to DEWPC. *Id*. at 14-15.

• Olson testified that the Defendant believes the primary reason for setting Watson's salary

-10-

at $24,000 was to minimize Social Security tax.  *Id*. at 24.

• Olson testified that, in reaching its determination, the Defendant "didn't look to intent. We looked to the fair value of the services provided by the shareholder employee to determine the amounts that were subject to Social Security tax."  *Id*. at 25.

• Olson testified that setting Watson's salary low could have had a negative impact on his later entitlement to Social Security benefits.  *Id*. at 25-26.

## III.  LEGAL CONCLUSIONS

The Federal Insurance Contributions Act ("FICA") imposes "on every employer an excise tax, with respect to having individuals in his employ, equal to [a certain] percentage[] of the wages paid by him with respect to employment."  26 U.S.C. § 3111(a).  The term "wages" is defined broadly by FICA as "all remuneration for employment."[4]  26 U.S.C. § 3121(a).  Thus, an employer, such as DEWPC, is required to pay FICA tax on all wages paid to its employees.  *See HB&R, Inc. v. United States*, 229 F.3d 688, 690 (8th Cir. 2000).  An employer is not, however, obligated to pay FICA tax on "other types of employee income, such as dividends."  *Id*.  There is no dispute in this case that Watson was an employee of DEWPC.  There is, likewise, no dispute that if the funds paid to Watson are properly characterized as dividends, DEWPC need not pay FICA taxes on them, but that if the funds are properly recharacterized as wages, DEWPC would be required to pay FICA tax.

The IRS assessments against DEWPC are "entitled to a legal presumption of correctness."  *United States v. Fior D'Italia, Inc.*, 536 U.S. 238, 242 (2002).  Thus, DEWPC bears the burden to prove by a preponderance of the evidence that the IRS tax assessments are incorrect, as well as to prove what the correct assessments should be.  *See Armstrong v. United*

---

[4]  The definition of "wages" contains numerous exceptions, none of which are applicable in the present case.  *See* 26 U.S.C. § 3121(a)(1)-(23).

*States*, 366 F.3d 622, 625-26 (8th Cir. 2004) (citing *IA 80 Group, Inc. v. United States*, 347 F.3d

1067, 1071 (8th Cir. 2003)); *Mattingly v. United States*, 924 F.2d 785, 787 (8th Cir. 1991).

DEWPC additionally bears the burden of proving that the wages paid to Watson were

reasonable.  *RTS Inv. Corp. v. C.I.R.*, 877 F.2d 647, 650 (8th Cir. 1989) ("The determination of

what is reasonable compensation is a question of fact . . . .  The burden of proving

reasonableness of compensation is on the taxpayer.").  The fact that the United States is

defending this suit using a different methodology than the one it used in making its initial

assessment against DEWPC is of little import, and does not change the Court's analysis.  *See*

*Blansett v. United States*, 283 F.2d 474, 478 (8th Cir. 1960) ("[A] deficiency assessment may be

sustained upon any legal ground supporting it, even though the Commissioner did not rely

thereon when the assessment was made.  If the assessment is right on any theory it must be

sustained." (citing *Helvering v. Gowran*, 302 U.S. 238 (1937)).

　　　DEWPC contends that it unquestionably intended to pay Watson compensation of

$24,000 per year, and that amounts distributed to Watson in excess of that amount are properly

classified as dividends and/or loans.  DEWPC points out that the United States has stipulated that

it does not have the authority to require DEWPC to pay Watson any particular minimum salary

before it can pay dividends to Watson.  According to DEWPC, the United States' ability to

assess additional employment taxes is limited to taxing payments which were intended to be

compensatory in nature.  Thus, DEWPC maintains, as it did at summary judgment, that it is the

intent of DEWPC that controls whether funds paid to Watson are categorized as wages or as

dividends.  DEWPC claims its intent is evidenced by Watson's testimony and trial evidence

showing that DEWPC opted to pay Watson $24,000 annually for "legitimate business reasons,

and not for the purposes of reducing [DEWPC's] employment tax liability, and therefore, [DEWPC] and Watson's classification of the distributions to Watson in excess of $24,000.00 per year as dividends should not be ignored."  Pl.'s Proposed Findings of Fact & Conclusions of Law (hereinafter Pl.'s Br.) at 6.

As it did at summary judgment, DEWPC cites *Electric & Neon, Inc. v. Commissioner of Internal Revenue*, 56 T.C. 1324 (1971), *Paula Construction Co. v. Commissioner of Internal Revenue*, 58 T.C. 1055 (1972), and *Pediatric Surgical Associates, P.C. v. Commissioner of Internal Revenue*, T.C. Memo 2001-81 (Apr. 2, 2001), in support of its position.  After evaluating each of those cases in its summary judgment order (Clerk's No. 17),[5] the Court determined that the cases were inapposite, because in each of those cases, "the *taxpayer* was attempting to recharacterize funds, whereas in the present case, it is the Government that is attempting to recharacterize the funds."  Clerk's No. 17 at 10-11.  The Court noted that the distinction was discussed in the 1993 edition of the *Akron Tax Journal*:

> "The courts and the Service seem to have adopted a double standard.  In the context of taxpayer attempts at recharacterization, "intent" has dominated the decisions.  But the courts have found intent irrelevant where the Service is arguing for recharacterization.  This outcome may be justified to the extent the taxpayer is distorting the actual character of payments received from the corporation for tax advantage."

*Id*. at 18 (quoting Harrington, Kirsten, *Employment Taxes:  What Can the Small Businessman Do?*  10 Akron Tax J. 61, 69 (1993)).  The Court further stated that the incentive for S

---

[5] The Court incorporates by reference both the undisputed facts and the legal analysis in its May 27, 2010 ruling on summary judgment.  *See* Clerk's No. 17.  Given that the issues at the bench trial are virtually identical to those raised at summary judgment, this Order will quote extensively from the May 27, 2010 summary judgment order, though not always with direct citation thereto.

corporations to distort the actual character of payments to its shareholders/employees to obtain a

tax advantage had been recently articulated by Judge Richard A. Posner:

> "The distinction between accounting profits, losses, assets, and liabilities, on the one hand and cash flow on the other is especially important when one is dealing with either a firm undergoing reorganization in bankruptcy or a small privately held firm; in the latter case, in order to avoid double taxation (corporate income tax plus personal income tax on dividends), the company might try to make its profits disappear into officers' salaries.  *See Menard, Inc. v. Commissioner*, 560 F.3d 620, 621 (7th Cir. 2009).  The owners of a Subchapter S corporation, however, have the oppositive incentive–to alchemize salary into earnings.  A corporation has to pay employment taxes, such as state unemployment insurance tax and social security tax, on the salaries it pays.  A Subchapter S corporation can avoid paying them by recharacterizing salary as a distribution of corporation income."

*Id*. at 11 (quoting *Constr. & Design Co. v. United States Citizenship & Immigration Servs.*, 563

F.3d 593, 595-96 (7th Cir. 2009)).

The Court reaffirms the analysis it undertook in evaluating DEWPC's motion for

summary judgment.  DEWPC's assertion that its own intent controls the characterization of funds

paid to Watson is only minimally supported by the case law it cites, and is undermined by

relevant IRS rulings and case law that are more in line with the facts of this case than *Electric &*

*Neon*, *Paula*, or *Pediatric Surgical Associates*, *P.C.*   First, in a 1974 Revenue Ruling, two sole

shareholders of a corporation sought advice on whether they would incur liability for employment

taxes on facts similar to the present case.   Rev. Rul. 74-44 (1974).  The shareholders "performed

services for the corporation.  However, to avoid the payment of Federal employment taxes, they

drew no salary from the corporation but arranged for the corporation to pay them 'dividends' [in

an amount equal to] the amount they would have otherwise received as reasonable compensation

for services performed."  *Id*.  The IRS stated that the dividends "were reasonable compensation

for services" performed by the shareholders "rather than a distribution of the corporation's

earnings and profits." *Id*. Accordingly, the dividends would properly be characterized as "wages" for which "liability was incurred for the taxes imposed by [FICA and other federal employment taxes]." *Id*. This conclusion comports with an earlier Revenue Ruling stating:

> Neither the election by the corporation as to the manner in which it will be taxed for Federal income tax purposes nor the consent thereto by the stockholder-officers has any effect in determining whether they are employees or whether payments made to them are 'wages' for Federal employment tax purposes.

Rev. Rul. 73-361 (1973).

Of the relevant case law, the Court finds *Joseph Radtke, S.C. v. United States* and *Spicer Accounting, Inc. v. United States* particularly persuasive. In *Joseph Radtke, S.C.*, the district court determined that certain funds designated as dividends were actually compensation for which an S corporation owed employment taxes. 712 F. Supp. 143 (E.D. Wis. 1989). Radtke, a Wisconsin attorney, had created an S corporation to provide legal services in Milwaukee. *Id*. at 144. Radtke was the firm's sole director, shareholder, and full-time employee, but he took no salary, receiving instead $18,225 in dividend payments from the corporation in 1982. *Id*. Since Radtke received the funds as dividends, rather than as wages, the corporation did not pay employment taxes on them. *Id*. The IRS recharacterized the funds as wages and assessed FICA and other employment taxes on them, along with penalties and interest. *Id*. at 145. In concluding that the funds were properly recharacterized as wages rather than dividends, the district court stated:

> I am not moved by the Radtke corporation's connected argument that "dividends" cannot be "wages." Courts reviewing tax questions are obligated to look at the substance, not the form, of the transactions at issue. *Frank Lyon Co. v. United States*, 435 U.S. 561, 573 (1978). Transactions between a closely held corporation and its principals, who may have multiple relationships with the corporation, are subject to particularly careful scrutiny. *Tulia Feedlot, Inc. v. United States*, 513 F.2d 800, 805

(5th Cir. 1975). Whether dividends represent a distribution of profits or instead are compensation for employment is a matter to be determined in view of all the evidence. *Cf. Logan Lumber Co. v. Commissioner*, 365 F.2d 846, 851 (5th Cir. 1966) (examining whether dividends were paid in guise of salaries).

In the circumstances of this case–where the corporation's only director had the corporation pay himself, the only significant employee, *no* salary for substantial services–I believe that Mr. Radtke's "dividends" were in fact "wages" subject to FICA and FUTA taxation. His "dividends" functioned as remuneration for employment . . . .

An employer should not be permitted to evade FICA and FUTA by characterizing *all* of an employee's remuneration as something other than "wages." *Cf. Greenlee v. United States*, 87-1 U.S.T.C. ¶ 9306 (corporation's interest-free loans to sole shareholder constituted "wages" for FICA and FUTA where loans were made at shareholder's discretion and he performed substantial services for corporation). This is simply the flip side of those instances in which corporations attempt to disguise profit distributions as salaries for whatever tax benefits that may produce.

*Id.* at 146. Radtke appealed the district court's decision to the Seventh Circuit, which framed the issue as, "whether, based on the statutes and unusual facts involved, the payments at issue were made to Mr. Radtke as remuneration for services performed." *Joseph Radtke, S.C. v. United States*, 895 F.2d 1196, 1197 (7th Cir. 1990). "As the district judge determined, these payments were clearly remuneration for services performed by Radtke and therefore fall within the statutory and regulatory definitions of wages." *Id.*

Relying on *Radtke* and the Revenue Rulings cited *supra*, the Ninth Circuit also determined, in a case remarkably similar to the one at bar, that payments designated as dividends can properly be recharacterized by the IRS as wages subject to federal employment taxes. *See Spicer Accounting, Inc. v. United States*, 918 F.2d 90 (9th Cir. 1990). Spicer, a licensed public accountant, was the president, treasurer, and director of an S Corporation, Spicer Accounting, Inc. *Id.* at 91. Spicer and his wife were the only stockholders in the corporation, and Spicer performed

substantial services for the corporation.  *Id*. at 91-92.  Spicer had an arrangement with the corporation whereby he would "donate his services to the corporation" and "withdraw earnings in the form of dividends."  *Id*. at 91.  For tax years 1981 and 1982, the IRS recharacterized dividend payments to Spicer by the corporation as wages, and assessed taxes, penalties, and interest against the corporation for unpaid employment taxes.  *Id*.  The Ninth Circuit affirmed the characterization of payments to Spicer as wages, emphasizing that it is the substance rather than the form of the transaction that matters, and noting that "salary arrangements between closely held corporations and its shareholders warrant close scrutiny."  *Id*. at 92.  Citing to *Radtke*, the *Spicer* court found that, "regardless of how an employer chooses to characterize payments made to its employees, the true analysis is whether the payments are for remunerations for services rendered."  *Id*. at 93. According, "Mr. Spicer's intention of receiving the payments as dividends has no bearing on the tax treatment of these wages."  *Id*.

Other courts have reached conclusions similar to those in *Radtke* and *Spicer*.  For instance, in *Veterinary Surgical Consultants v. Commissioner of Internal Revenue*, the United States Tax Court rejected a petitioner's argument that amounts paid to its sole shareholder were distributions of corporate net income rather than wages.  117 T.C. 141, 145 (2001).

> Dr. Sadanaga performed substantial services on behalf of petitioner [the S corporation].  The characterization of the payment to Dr. Sadanaga as a distribution of petitioner's net income is but a subterfuge for reality; the payment constituted remuneration for services performed by Dr. Sadanaga on behalf of petitioner.  An employer cannot avoid Federal employment taxes by characterizing compensation paid to its sole director and shareholder as distributions of the corporation's net income, rather than wages.  Regardless of how an employer chooses to characterize payments made to its employees, the true analysis is whether the payments represent remunerations for services rendered.

*Id*. at 145-46.  Likewise, in *JD  & Associates, Ltd. v. United States*, Jeffrey Dahl, the sole

shareholder, officer, and director of the plaintiff S corporation, received an annual salary of

$19,000.00 in 1997 and $30,000.00 for each of 1998 and 1999.  No. 3:04-cv-59, at 4 (D.N.D.

May 19, 2006) (available in Def.'s App. to Summ. J. at 146-56 (Clerk's No. 14.3)).  Dahl also

received dividends of $47,000 for 1997, $50,000 for 1998, and $50,000 for 1999.  *Id*. at 5.  As in

the present case, the IRS determined that Dahl's salary was unreasonably low, and assessed

employment taxes, interest, and penalties against the corporation after recharacterizing portions of

the dividend payments as wages to Dahl.  *Id*. at 1.  Applying an Eighth Circuit test to determine

whether Dahl's compensation was reasonable, the district court concluded it was not and upheld

the tax assessments against the corporation.  *Id*. at 9-11.

        Upon review of the law, the Court holds that the characterization of funds disbursed by an

S corporation to its employees or shareholders turns on an analysis of whether the "payments at

issue were made . . . as remuneration for services performed."  *Radtke*, 895 F.2d at 1197.  This

approach conforms with well settled jurisprudence holding that tax consequences are governed by

the economic realities of a transaction, not by the form of the transaction or labels given it by the

parties.  *See*, *e.g.*, *Boulware v. United States*, 552 U.S. 421, 430 (2008) ("The colorful behavior

described in the allegations requires a reminder that tax classifications like 'dividend' and 'return

of capital' turn on 'the objective economic realities of a transaction rather than . . . the particular

form the parties employed.'") (quoting *Frank Lyon*, 435 U.S. at 573); *Pinson v. Comm'r of*

*Internal Revenue*, T.C. Memo 2000-208 (July 6, 2000) ("As a general rule, the substance of a

transaction controls tax treatment." (citing *Gregory v. Helvering*, 293 U.S. 465, 469-70 (1935));

*True v. United States*, 190 F.3d 1165, 1173-74 (10th Cir. 1999) (stating that "substance over

form" is a "fundamental tax principle [that] operates to prevent the 'true nature of a transaction

from being disguised by mere formalisms, which exist solely to alter tax liabilities'" (quoting *Comm'r v. Court Holding Co.*, 324 U.S. 331 (1945)); *Leisure Dynamics, Inc. v. Comm'r of Internal Revenue*, 494 F.2d 1340, 1345 (8th Cir. 1974) ("For tax purposes, we must concern ourselves with actualities rather than the refinements of title; our concern is with the substance, not form.").  Thus, a determination of whether funds are "remuneration for services performed," must be made "in view of all the evidence."  *Radtke*, 712 F. Supp. at 145.  While intent is unquestionably a consideration in the analysis, it is by no means the only one.  Other relevant considerations include, but are not limited to:  1) the employee's qualifications; 2) the nature, extent and scope of the employee's work; 3) the size and complexities of the business; 4) a comparison of salaries paid with the gross income and the net income; 5) the prevailing general economic conditions; 6) comparison of salaries with distributions to stockholders; 7) the prevailing rates of compensation for comparable positions in comparable concerns; 8) the salary policy of the taxpayer as to all employees; and 9) in the case of small corporations with a limited number of officers the amount of compensation paid to the particular employee in previous years.  *See Charles Schneider & Co., Inc. v. Comm'r of Internal Revenue* 500 F.2d 148, 182 (8th Cir. 1974) (identifying factors to be considered in determining the "reasonableness of compensation").

        After considering the trial testimony, and all exhibits and evidence in this case, the Court finds Watson's assertion that DEWPC "intended" to pay Watson a mere $24,000 in compensation for the tax years 2002 and 2003 to be less than credible.  Indeed, the Court is convinced upon the entire record that substantial portions of the distributions from LWBJ to DEWPC, and in turn to Watson were, in fact, "remuneration for services performed."  Watson is an exceedingly qualified accountant, with both bachelor's and advanced degrees and with approximately 20 years

-19-

experience in accounting and taxation.  He worked approximately 35 to 45 hours per week as one

of the primary earners in a reputable and well-established firm, which had earnings well in excess

of comparable firms, with over $2 million in gross revenues for 2002 and nearly $3 million in

gross revenues for 2003.  Tr. at 30, 68, 78; Exs. 12-13.  A reasonable person in Watson's role

within LWBJ would unquestionably be expected to earn far more than a $24,000 salary for his

services.  As such, the $24,000 salary Watson opted to pay himself as DEWPC's sole shareholder,

officer, and employee, is incongruent with the financial position of LWBJ and in light of

Watson's experience and contributions to LWBJ, and when compared to the approximately

$200,000 in distributions DEWPC received in each of 2002 and 2003.  Moreover, the $24,000

salary is low when compared to salaries that could reasonably be expected to be earned by

persons with experience similar to that of Watson, and holding a position such as Watson held in

a firm comparable to LWBJ.  Indeed, upon evaluation of all of the facts and circumstances in this

case, the Court is convinced that DEWPC structured Watson's salary and dividend payments in

an effort to avoid federal employment taxes, with full knowledge that dividends paid to Watson

were actually "remuneration for services performed."   *See*, *e.g.*, *Tool Producers, Inc. v. Comm'r*

*of Internal Revenue*, No. 95-2056, 1996 WL 515344, at *3 (6th Cir. Sept. 10, 1996) ("In

determining the intent behind a corporate distribution, we have held that a court should 'look not

to mere labels or to the self-serving declarations of the parties, but to more reliable criteria of the

circumstances surrounding the transaction.'" (quoting *Jacques v. Comm'r of Internal Revenue*,

935 F.2d 104, 107 (6th Cir. 1991)); *Electric & Neon*, 56 T.C. at 1340 (finding that a corporation

may deduct the amount of compensation that it pays so long as it "actually intended" to pay the

relevant funds as compensation, but noting that "whether such intent has been shown is, of

course, a factual question to be decided on the basis of the particular facts and circumstances of the case"); *Paula*, 58 T.C. at 1058-59 ("It is now settled law that only if payment is made with the intent to compensate is it deductible as compensation.  Whether such intent has been demonstrated is a factual question to be decided on the basis of the particular facts and circumstances of the case." (internal citations omitted)).

The Court further finds the testimony of Igor Ostrovsky to be abundantly reasonable and credible.  Ostrovsky's calculations, though they changed somewhat over time due to his receipt of additional information, are amply supported in their methodology and reach a well-reasoned conclusion as to what constitutes a "reasonable" salary for Watson under the facts and circumstances of this case.  Accordingly, the Court adopts Ostrovsky's calculations and finds that, for each of the years 2002 and 2003, the reasonable amount of Watson's "remuneration for services performed" was $91,044.  This amount is $67,044 more than the $24,000 annual salary paid by DEWPC to Watson, and DEWPC, accordingly, is obligated to pay the appropriate FICA taxes, interest, and penalties on the recharacterized amounts.

Having established that DEWPC owes FICA taxes, penalties and interest on an additional $67,044 for each of the tax years 2002 and 2003, there remains one additional issue.  Specifically, since taxes are imposed on a quarterly, rather than on an annual, basis, there still exists the question of whether the $67,044 should be imposed as wages ratably throughout each of the two years.  DEWPC argues that, based on the Government's initial assessments, the amount of compensation would all be taxable only in the first two quarters of each tax year, with the remainder of funds paid to Watson comprising distributions only in the third and fourth quarters.  According to Plaintiff's calculations, this would result in DEWPC only owing employment taxes,

interest and penalties for recharacterized wages in the first two quarter of each tax year, meaning

that DEWPC should succeed on its claim for a refund for the fourth quarter of 2002.  The Court

disagrees.  An evaluation of the record demonstrates that Watson was paid his allotted $24,000

salary in equal installments throughout the course of each tax year, with payments occurring in

each of the four quarters of 2002 and 2003.  The designated "distribution" payments were also

made in installments throughout the year, with payments occurring in each of the four quarters of

2002 and 2003.  Plaintiff offers no legal support for the proposition it would now have the Court

adopt, i.e., that Watson received all his remuneration for services rendered in the first two

quarters of each tax year.  Indeed, had Watson's "salary" been set at $91,044 to begin with, he

undoubtedly would have received such salary in ratable installments throughout each year, as

virtually all salaried employees do.  Accordingly, the Court finds that, unless the parties agree

otherwise, the additional $67,044 in compensation should be applied ratably throughout each of

the two years, with $16,761 in additional compensation attributed to each of the eight quarters of

2002 and 2003.

## IV.  CONCLUSION

For the reasons stated herein, the Court concludes that Plaintiff's $24,000 salary in 2002

and 2003 was unreasonable.  The Government's recharacterization of $67,044 in dividend

payments to Watson for each of the tax years 2002 and 2003 is amply supported by the evidence,

as an annual salary of $91,044 for Watson is reasonable on the specific facts and circumstances of

this case.  Accordingly, DEWPC fails on its claim for refund of all taxes paid for the fourth

quarter of 2002,[6] and the United States has prevailed on its counterclaim that DEWPC owes

additional employment taxes, penalties and interest on a $91,044 salary for Watson for 2002 and

2003.  The parties shall submit a joint proposed judgment, with final calculations of employment

taxes, interest and penalties owed, based on the Court's findings of facts and conclusions of law

within thirty days of the date of this Order.

IT IS SO ORDERED.

Dated this ___23rd___ day of December, 2010.

ROBERT W. PRATT, Chief Judge
U.S. DISTRICT COURT

---

[6] The Court notes that, depending on the final tax calculations, DEWPC may be entitled to a *partial* refund of tax payments made for the fourth quarter of 2002.  This is because the Government initially recharacterized more of the dividends as wages, and the assessments were issued on these higher amounts.  Ultimately, however, since DEWPC will owe additional sums for the other seven quarters of 2002 and 2003, any potential refund would be offset by additional amounts owed.